# 22-2993-cv

# United States Court of Appeals

*for the*

# Second Circuit

———————————

LEXINGTON FURNITURE INDUSTRIES, INC.,
d/b/a Lexington Home Brands,

*Plaintiff-Counter-Defendant-Appellee,*

– v. –

THE LEXINGTON COMPANY, AB,
d/b/a The Lexington Clothing Company,

*Defendant-Counter-Claimant-Appellant.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
U.S.D.C. CASE NO. 1:19-cv-06239-PKC
HONORABLE P. KEVIN CASTEL, PRESIDING

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-COUNTER-CLAIMANT-APPELLANT

TIMOTHY D. PECSENYE
BLANK ROME LLP
*Attorney for Defendant-Counter-Claimant-Appellant*
One Logan Square
130 North 18th Street
Philadelphia, Pennsylvania 19103
(215) 569-5500

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellant THE LEXINGTON COMPANY, AB d/b/a THE LEXINGTON CLOTHING COMPANY, is 100% owned by Manna & Co Oy, a private, non-listed company. No publicly-held corporation owns 10% or more of The Lexington Company, AB's stock.

Dated: March 13, 2023        Respectfully submitted,

**BLANK ROME LLP**

By:  */s/ Timothy D. Pecsenye*
      Timothy D. Pecsenye
One Logan Square
30 North 18th Street
Philadelphia, PA 19103
Tel: 215.569.5619
Fax: 215.832.5619
Email: pecsenye@blankrome.com

*Attorneys for Defendant-Appellant*
*The Lexington Company, AB d/b/a/*
*The Lexington Clothing Company*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT

STATEMENT OF JURISDICTION.........................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................1

STATEMENT OF THE CASE.................................................................................2

    I.    FACTUAL BACKGROUND ...............................................................2

    II.    PROCEDURAL HISTORY ..................................................................5

SUMMARY OF ARGUMENT ...............................................................................8

ARGUMENT ........................................................................................................10

    I.    Standard of review.............................................................................10

    II.    The evidence presented at trial does not support a finding of infringement at LCC's brick and mortar stores prior to 2017............11

    III.    The evidence presented at trial does not support a finding of likelihood of confusion........................................................................13

        a.    LFI's Marks are weak and descriptive, and evidence fails to show that they have acquired secondary meaning...............14

            i    The LFI Marks are geographically descriptive. ............14

            ii    LFI's evidence fails to establish that the LFI Marks have acquired secondary meaning......................16

            iii    LFI Marks are not utilized as source identifiers.............18

            iv    Myriad third-party registrations underscore weakness of LFI Marks. ...................................................20

        b.    The parties' marks are not similar. ...........................................21

        c.    The parties' products are not proximate and LFI presented no evidence of bridging the gap. .............................24

        d.    LFI presented no evidence of actual confusion. .......................25

i

      e.    LFI presented no evidence of bad faith. ..................................27

      f.    The evidence of quality of products and sophistication of consumers do not support a finding of likelihood of confusion. ...................................................................................28

IV.    The district court erred in awarding a disgorgement of profits without considering equitable factors. ...................................29

V.    The punitive damages award should be reversed................................34

      a.    Punitive damages were not legally available absent an award of actual damages. ............................................................34

      b.    There was no evidence that LCC engaged in conduct amounting to gross, wanton, or willful fraud, or other morally culpable conduct to an extreme degree. .....................37

CONCLUSION ....................................................................................................38

CERTIFICATE OF COMPLIANCE....................................................................40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*20th Century Wear Inc., v. Sanmark-Stardust Inc.*,
  747 F.2d 81 (2d Cir. 1984) ................................................................16

*Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*,
  1996 WL 929597 (S.D.N.Y. Oct. 21, 1996).......................................18

*Akiro LLC v. House of Cheatham, Inc.*,
  946 F. Supp. 2d 324 (S.D.N.Y. 2013) ...............................................21

*Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's
  Found. of Am., Inc.*,
  307 F. Supp. 3d 260 (S.D.N.Y. 2018) ...............................................14

*Bath & Body Works Brand Mgmt., Inc. v. Summit Entm't, LLC*,
  7 F. Supp. 3d 385 (S.D.N.Y. 2014) ...................................................27

*Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*,
  2020 WL 1673687 (S.D.N.Y. Apr. 6, 2020) ......................................18

*Braun, Inc. v. Dynamics Corp. of Am.*,
  975 F.2d 815 (Fed. Cir. 1992) ...........................................................17

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*,
  973 F.2d 1033 (2d Cir. 1992) ............................................................16

*Broadnax v. City of New Haven*,
  415 F.3d 265 (2d Cir. 2005) ........................................................32, 33

*Bus. Trends Analysts, Inc. v. Freedonia Grp., Inc.*,
  887 F.2d 399 (2d Cir. 1989) ..............................................................12

*Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*,
  433 F.2d 686 (2d Cir. 1970) ..............................................................30

*Connors v. Hallmark & Son Coal Co.*,
  935 F.2d 336 (D.C. Cir. 1991)...........................................................10

iii

*Cont'l Corrugated Container Corp. v. Cont'l Grp., Inc.*,
    462 F. Supp. 200 (S.D.N.Y. 1978) ....................................................14

*Disney Enterprises, Inc. v. Sarelli*,
    322 F. Supp. 3d 413 (S.D.N.Y. 2018) ..............................................27

*Dyson v. District of Columbia*,
    710 F.3d 415 (D.C. Cir. 2013).........................................................10

*E.J. Brooks Co. v. Cambridge Sec. Seals*,
    105 N.E.3d 301 (N.Y. 2018)...........................................................36

*Easy Spirit, LLC v. Skechers U.S.A, Inc.*,
    515 F.Supp.3d 47 (S.D.N.Y. 2021) .................................................15

*Ebker v. Tan Jay Int'l Ltd.*,
    741 F. Supp. 448 (S.D.N.Y. 1990), *aff'd sub nom.*, *Ebker v. Tan
    Jay*, 930 F.2d 909 (2d Cir. 1991).....................................................35

*Eli Lilly & Co. v. Revlon, Inc.*,
    577 F. Supp. 477 (S.D.N.Y. 1983) ..................................................17

*Erchonia Corp. v. Bissoon*,
    410 F. App'x 416 (2d Cir. 2011) .....................................................16

*Ergoton, Inc. v. Hergo Ergonomic Support Sys.*,
    1996 WL143903 (S.D.N.Y. 1996)...................................................17

*Fifth Third Mortg. Co. v. Kaufman*,
    934 F.3d 585 (7th Cir. 2019) .....................................................11, 33

*Franklin Res., Inc. v. Franklin Credit Mgmt. Corp.*,
    988 F. Supp. 322 (S.D.N.Y. 1997) ..................................................20

*George Basch Co., Inc. v. Blue Coral, Inc.*,
    968 F.2d 1532 (2d Cir.1992) ....................................................*passim*

*Gerhartz v. Richert*,
    779 F.3d 682 (7th Cir. 2015) ..........................................................11

*Getty Petroleum Corp. v. Bartco Petroleum Corp.*,
    858 F.2d 103 (2d Cir. 1988) ......................................................34, 37

iv

*Gill v. Montgomery Ward & Co.*,
    284 A.D. 36 (3d Dep't, 1954) ................................................................35

*Greenpoint Fin. Corp. v. Sperry & Hutchinson Co.*,
    116 F. Supp. 2d 405 (S.D.N.Y. 2000) ...............................................15

*Gross v. Bare Escentuals Beauty Inc.*,
    641 F. Supp. 2d 175 (S.D.N.Y. 2008) ...............................................28

*Gucci Am., Inc. v. Weixing Li*,
    768 F.3d 122 (2d Cir. 2014) .................................................................32

*Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*,
    921 F.3d 1343 (11th Cir. 2019) .........................................................32

*Hubbell v. Trans World Life Ins. Co. of N.Y.*,
    408 N.E.2d 918 (N.Y. 1980) ...............................................................36

*Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC*,
    335 F. Supp. 3d 566 (S.D.N.Y. 2018) ...............................................23

*Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*,
    823 F.3d 153 (2d Cir. 2016) .................................................................14

*Kohler Co. v. Bold Int'l FZCO*,
    422 F.Supp.3d 681 (E.D.N.Y. 2018) .................................................15

*L & L Wings, Inc. v. Marco-Destin Inc.*,
    756 F. Supp. 2d 359 (S.D.N.Y. 2010) ..........................................37, 38

*Lang v. Retirement Living Pub. Co.*,
    949 F.2d 576 (2d Cir. 1991) ............................................................26, 27

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
    209 F. Supp. 3d 612 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d
    Cir. 2017) ..............................................................................................29

*Maier-Schule GMC, Inc. v. General Motors Corp.*,
    850 F. Supp. 1095 (W.D.N.Y. 1994), *aff'd*, 62 F.3d 1412 (2d Cir.
    1995) ...............................................................................................35, 38

*Major League Baseball Props., Inc. v. Opening Day Prods., Inc.*,
    1997 WL 525482 (S.D.N.Y. Aug. 22, 1997) ...................................................... 35

*Marinaccio v. Town of Clarence*,
    986 N.E.2d 903 (N.Y. 2013) .................................................................................. 37

*Medici Classics Prods., LLC v. Medici Grp., LLC*,
    683 F. Supp. 2d 304 (S.D.N.Y. 2010) ................................................................. 24

*Miss Universe, LP v. Villegas*,
    672 F. Supp. 2d 575 (S.D.N.Y. 2009) ................................................................. 25

*Montblanc-Simplo v. Aurora Due S.r.L.*,
    363 F. Supp. 2d 467 (E.D.N.Y. 2005) ................................................................. 15

*MyPlayCity, Inc. v. Conduit Ltd.*,
    2012 WL 1107648 (S.D.N.Y. Mar. 30, 2012), *adhered to on
    reconsideration*, 2012 WL 2929392 (S.D.N.Y. July 18, 2012) ........................ 34

*Nat'l Auto. Club v. Nat'l Auto Club, Inc.*,
    365 F. Supp. 879 (S.D.N.Y. 1973), *aff'd*, 502 F.2d 1162 (2d Cir.
    1974) .................................................................................................................... 15

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,
    269 F.3d 114 (2d Cir. 2001) ............................................................................... 27

*Paco Sport, Ltd. v. Paco Rabanne Parfums*,
    86 F. Supp. 2d 305 (S.D.N.Y. 2000) ................................................................. 29

*Polaroid Corp. v. Polarad Elecs. Corp.*,
    287 F.2d 492 (2d Cir. 1961) ....................................................................... *passim*

*Romag Fasteners, Inc v. Fossil, Inc.*,
    140 S. Ct. 1492 (2020) ........................................................................................ 31

*Savin Corp. v. Savin Grp.*,
    391 F.3d 439 (2d Cir. 2004) ................................................................... 14, 21, 24

*Sheldon v. Metro–Goldwyn Pictures Corp.*,
    309 U.S. 390 (1940) ............................................................................................ 12

*Sly Magazine LLC*, *v. Welder Publications LLC*,
   529 F. Supp. 2d 425 (S.D.N.Y. 2007) .................................................26

*Smith v. Lightning Bolt Prods., Inc.*,
   861 F.2d 363 (2d Cir.1988) ...............................................................37

*Sports Traveler, Inc. v. Advance Magazine Publishers, Inc.*,
   25 F. Supp. 2d 154 (S.D.N.Y. 1998) ..................................................18

*Star Indus., Inc. v. Bacardi & Co.*,
   412 F.3d 373 (2d Cir. 2005) ...............................................14, 27, 29

*Strange Music, Inc. v. Strange Music, Inc.*,
   326 F. Supp. 2d 481 (S.D.N.Y. 2004) ................................................23

*The Sports Auth., Inc. v. Prime Hosp. Corp.*,
   89 F.3d 955 (2d Cir. 1996) .................................................................26

*The Trustees of Columbia University v Columbia/HC4 Healthcare
   Corp.*,
   964 F. Supp. 733 (S.D.N.Y. 1997) ..............................................20, 21

*Troublé v. Wet Seal, Inc.*,
   179 F.Supp.2d 291 (S.D.N.Y. 2001) ..................................................12

*Tull v. United States*,
   481 U.S. 412 (1987).............................................................................33

*TVT Records v. Island Def Jam Music Grp.*,
   412 F.3d 82 (2d Cir. 2005) .................................................................11

*Yamaha Int'l Corp. v. Hoshino Gakki Co.*,
   840 F.2d 1572 (Fed. Cir. 1988) ..........................................................16

**Statutes**

15 U.S.C. § 1114......................................................................................5

15 U.S.C. § 1117(a) ..................................................................30, 34, 36

15 U.S.C. § 1125(a) ..................................................................................5

15 U.S.C. § 1125(c) ..................................................................................5

28 U.S.C. § 1291 ...................................................................1

28 U.S.C. § 1331 ...................................................................1

N.Y. Gen. Bus. Law § 349 ....................................................5

N.Y. Gen. Bus. Law § 360-1 .................................................5

**Other Authorities**

Fed. R. App. P. 32(a)(5)........................................................40

Fed. R. App. P. 32(a)(7)(B) ..................................................40

Fed. R. App. P. 32(a)(b)........................................................40

Fed. R. App. P. 32(f)............................................................40

Fed. R. Civ. P. 38 .................................................................31

Fed. R. Civ. P. 38(b) ............................................................31

Fed. R. Civ. P. 39(c).......................................................32, 33

Fed. R. Civ. P. 39(c)(2)........................................................32

Fed. R. Civ. P. 59(e)......................................................*passim*

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction over this action under 28 U.S.C. § 1331. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because the District Court entered a final judgment in the action on June 2, 2022, and an Opinion and Order denying Defendant-Appellant's motion to alter the Judgment on October 24, 2022. Defendant-Appellant filed a timely notice of appeal on November 22, 2022.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. In 2012 the parties settled a trademark dispute concerning rights to the Lexington mark. Under the Settlement Agreement, Appellant LCC is entitled to use the mark in connection with home textiles in defined manners. At trial LFI failed to present evidence that Appellee LFI used the mark at its retail stores prior to 2017 in a manner other than as permitted by the Settlement Agreement. But the jury awarded damages based on sales at the stores. Did the court err in denying LCC's Rule 59(e) motion to alter the judgment to exclude from damages revenue earned prior to 2017?

2. LCC uses the mark Lexington and a unique flag logo with the mark Lexington, as relevant here, for home textiles, while LFI uses the Lexington mark for furniture. There have been no instances of actual confusion over an eleven-year period. Did the court err in finding that there was sufficient evidence of likelihood of confusion as a matter of law?

1

3.     Before awarding disgorgement of profits, a trial court must consider the equitable factors set forth in *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532 (2d Cir.1992).  Did the court err in awarding disgorgement without considering the equitable factors?

4.     Punitive damages are not available under New York law where the plaintiff did not suffer actual damages.  LFI offered no evidence of actual damages, yet the court awarded punitive damages.  Did the court err?

## STATEMENT OF THE CASE

### I.     FACTUAL BACKGROUND

Defendant-Appellant The Lexington Company, AB d/b/a The Lexington Clothing Company ("LCC") is a global brand offering fashion apparel and home textiles.  LCC owns various trademark applications and registrations worldwide for the Lexington mark, including in the United States, covering an array of goods such as clothing, household linens and textiles.  (A-1158-59 (Ex. DX-8); A-1160-62 (Ex. DX-9); A-1163-66 (Ex. DX-10); A-1167-68 (Ex. DX-11))

Plaintiff-Appellee Lexington Furniture Industries, Inc. d/b/a Lexington Home Brands ("LFI") is a manufacturer, distributor, and retailer of furniture in the United States.  LFI owns the following registrations in the United States for the "LEXINGTON" mark, all of which are registered in connection with furniture and related services:  (1) U.S. Reg. No. 4468729 for LEXINGTON HOME BRANDS; (2) U.S. Reg.

2

No. 4379049 for LEXINGTON; (3) U.S. Reg. No. 2684161 for LEXINGTON HOME BRANDS; (4) U.S. Reg. No. 1504866 for LEXINGTON; and (5) U.S. Reg. No. 1576409 for LEXINGTON FURNITURE INDUSTRIES (collectively, the "LFI Marks").  (A-71-72 (Am. Compl.) at ¶ 7)

LFI does not use the LFI Marks as the primary brand name for its products, but instead markets and sells its products, including both furniture and household linens, under brand names that it licenses such as TOMMY BAHAMA, ARTISTICA HOME, BARCLAY BUTERA, and SLIGH, which names also appear on LFI's products.  (A-670 at 469:4-12)  LFI does not sell any furniture that bears only the Lexington name.  (A-673, 676-79 at 472:10-23, 475:19-22, 476:9-20, 477:25-478:20)

Over thirteen years ago, a dispute arose between the parties regarding their respective uses of the Lexington mark in the United States—LFI's use of the mark for furniture and LCC's use of the mark for home textiles (LCC's use of the Lexington mark for clothing is not at issue).  The dispute was resolved with a Settlement Agreement entered on January 12, 2012 (the "Settlement Agreement"), that outlined LCC's right to use the Lexington mark for home textiles in the United States.  (A-913-16 (Ex. AC))  The Settlement Agreement does not affect LCC's rights abroad.  *Id.*

3

The Settlement Agreement provides, *inter alia*:

- LCC will use "Lexington Clothing Co." as the primary identifier of its home textile goods.

- LCC's brick and mortar stores will "be labeled" as Lexington Clothing Co. on the storefronts. The following is an image of one of LCC's three stores, each of which has the same treatment of Lexington Clothing Co. (A-1169-71 (Ex. DX-69))



- Home textiles sold in LCC's stores may bear LCC's "Flag Logo," set forth below:

4



In 2017, LFI was acquired by a China-based company that produces and distributes home textile products. (A-531 at 330:15-20) Following the acquisition, LFI filed the underlying lawsuit. (A-70-93 (Am. Compl.))

## II.   PROCEDURAL HISTORY

LFI brought this case in July 2019 in the District Court for the Southern District of New York, alleging trademark infringement under 15 U.S.C. § 1114, unfair competition and false designation of origin under 15 U.S.C. § 1125(a), trademark dilution under 15 U.S.C. § 1125(c), unfair trade practices under N.Y. Gen. Bus. Law § 349, trademark dilution under N.Y. Gen. Bus. Law § 360-1, and common law claims including breach of contract, trademark infringement, unfair competition, and unjust enrichment.

A five-day jury trial commenced on May 26, 2022 before the Honorable P. Kevin Castel on LFI's Lanham Act claim, state law unfair competition claim, and breach of contract claims after which the jury issued a verdict finding that LCC breached the Settlement Agreement and infringed on LFI's trademarks. The jury awarded disgorgement of profits and punitive damages based on this verdict. (A-200) Following the verdict, the trial court entered a June 2, 2022 Judgment (with no

written opinion) awarding LFI $1.00 in nominal damages on the breach of contract claim, disgorgement of LCC's profits in the amount of $1,641,963, and $925,000 in punitive damages on the unfair competition claim, for a total damages award in favor of LFI and against LCC in the amount of $2,566,964 (the "Judgment").  (SPA-1) The award of $1,641,963 equals the amount of LCC's total revenue from both online and in-store sales of "home" and "other" non-clothing goods for the period 2012 through November 2021.  (A-328-30; A-785-786 at 127:4-129:25; 584:23-585:8)

Following the Judgment, on June 30, 2022, LCC filed a Motion to Alter Judgment pursuant to Rule 59(e) (the "59(e) Motion").  In seeking amendment of the damages award, LCC argued, in part, that the trial court should not have awarded disgorgement of profits prior to 2017 because LFI failed to prove infringement by LCC prior to that time.  (A-1050)  LCC further argued that LFI presented no evidence of LCC violating the terms of the Settlement Agreement, nor any evidence of any actual consumer confusion prior to 2017 that could form the basis of infringement, and that the period prior to 2017 should therefore be excluded from any profit disgorgement calculation.  (A-113)

LCC also argued in the Rule 59(e) Motion that the evidence LFI presented at trial was insufficient to support a finding of likelihood of confusion as a matter of law.  (A-1053-65)  LCC explained that the trial record was devoid of evidence supporting the *Polaroid* factors such that the finding of a likelihood of confusion

6

between LCC's home textiles and clothing and LFI's furniture was clearly erroneous. (*Id.*)

LCC further argued in the Rule 59(e) Motion that, because disgorgement is an equitable remedy, the trial court was required to make its own findings of law and fact. LCC explained that disgorgement is not automatic and requires the trial court to weigh the equitable principles identified in *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532 (2d Cir.1992).

Finally, LCC argued that LFI was not entitled to punitive damages because LFI had not affirmatively sought actual damages, which is a requirement for a punitive damages finding under New York law.

The trial court issued an Opinion and Order dated October 24, 2022 denying the 59(e) Motion (the "Order"). (SPA-2-26) In the Order, the trial court cited to what it characterized as "ample evidence of infringement prior to 2017," (SPA-16), and found, upon review of the *Polaroid* factors, that a "reasonable jury could find a likelihood of confusion." (SPA-4) The Order further held that "LCC forfeited any right it may have had to have the disgorgement remedy tried to the Court" by failing to object to the issue of disgorgement of profits being submitted to and decided by the jury. (SPA-11-12)

The Order also found that punitive damages were permissible because the jury was properly instructed and there is "nothing about the nature of disgorgement

damages that precludes them from serving as the premise for a punitive damage claim." (SPA-19)  The Order further identified purported examples of "actual harm" in the trial record.  (SPA-21)  Finally, the Order granted LFI's motion for a permanent injunction enjoining LCC's use of Lexington-formative marks on products or advertising sold in or directed to the United States.  (SPA-22-25)

LCC timely filed the Notice of Appeal on November 22, 2022.  (A-1156-57 (Notice of Appeal))  On December 15, 2022, the Court entered a scheduling order directing LCC to file its opening brief on or before March 6, 2023; on March 6, this Court extended LCC's filing deadline to March 13, 2023.  (Dkt. Nos. 26, 35)  The parties participated in CAMP mediation with Dean W. M. Leslie, Circuit Mediator, on January 20, 2023, but were unable to resolve this matter.

## SUMMARY OF ARGUMENT

LFI failed to present any evidence that LCC breached the Settlement Agreement or infringed its trademarks at its brick-and-mortar stores prior to 2017. Nevertheless, the jury awarded damages based on sales at LCC's stores prior to 2017.  And the court denied LCC's Rule 59(e) Motion to alter the Judgment to eliminate sales prior to 2017.  This was error.

The evidence at trial was insufficient as a matter of law to support a finding of likelihood of confusion between the marks.  But the court erred in denying LCC's Rule 59(e) Motion on infringement as well.

Even if the Court does not reverse the finding of infringement, the award of LLC's profits should be vacated. Disgorgement of profits under the Lanham Act is an equitable remedy that is not awarded as of right upon a finding of infringement. In *George Basch Co. v. Blue Coral Inc.,* 968 F.2d 1532, 1537 (2d Cir. 1992), this Court established a set of factors for district courts to consider in deciding whether to award disgorgement of profits upon a finding of infringement. The district court entered judgment without considering these factors, and on LCC's Rule 59(e) Motion, the district court did not even mention them. Accordingly, the disgorgement award should be vacated for the district court to consider whether such an award is appropriate under the framework established in *George Basch*.

Finally, there was no legal basis for an award of punitive damages. Punitive damages are not available under the Lanham Act. New York law—which would be the only basis for an award of punitive damages in this case—requires a showing of actual injury which would justify an award of actual or compensatory damages before punitive damages can be awarded. No actual damages were awarded, let alone sought. Accordingly, the punitive damages award cannot stand. Additionally, the award should be reversed because there was insufficient evidence to find that LCC engaged in the type of morally reprehensible culpable conduct that is necessary to support an award of punitive damages.

9

## ARGUMENT

### I.  Standard of review.

Where, as here, a motion pursuant to Federal Rule of Civil Procedure 59(e) presents a new argument that the trial court elected to review on its merits, it is appropriate for the appellate court to review the matter *de novo*.  Thus, for example, the Court of Appeals for the District of Columbia Circuit has explained:

> [W]e normally review district court denials of Rule 59(e) motions only for abuse of discretion. . . [t]here are some situations, however, in which we review the District Court's denial of a motion for reconsideration *de novo*. . . . In this case, the District Court did consider the merits of Appellant's new theory of equitable tolling.  Therefore, we review the matter *de novo* . . . .

*Dyson v. District of Columbia*, 710 F.3d 415, 420 (D.C. Cir. 2013) (citations omitted); *see also Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 341 (D.C. Cir. 1991) (Ginsburg, J.) (stating "[w]e review the district court's rejection of the Trustees' accrual theory de novo" supported by a footnote explaining "whether or not the Trustees' accrual theory was a 'new argument'" . . . the district court apparently decided the issue on the merits, in the same manner it decided other issues in the case. Accordingly, we do not review this matter differently from the other questions presented in this appeal.).

The Court of Appeals for the Seventh Circuit recently reached a similar conclusion:

> Fifth Third first argues that Kaufman waived the argument by failing to raise it prior to trial. Although an issue presented for the first time in a Rule 59(e) motion generally is not timely raised, 'such an issue is subject to appellate review if the district court exercises its discretion to consider the issue on the merits.' The district court considered Kaufman's Rule 59(e) motion raising Section 10-10 of the Illinois LLC Act on its merits so this Court will do the same.

*Fifth Third Mortg. Co. v. Kaufman*, 934 F.3d 585, 588 (7th Cir. 2019) (quoting *Gerhartz v. Richert*, 779 F.3d 682, 686 (7th Cir. 2015)).

Accordingly, because the trial court elected to review the arguments presented in LCC's Rule 59(e) motion on their merits, its decision on those arguments is subject to *de novo* review in this Court.

Finally, questions of law, such as whether punitive damages were legally available, are reviewed *de novo*. *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 87-88 (2d Cir. 2005) (questions of law, such as legal viability of a claim, are reviewed *de novo*).

## II. The evidence presented at trial does not support a finding of infringement at LCC's brick and mortar stores prior to 2017.

The parties, and the court below, agree that uses of the Lexington mark in conformance with the Settlement Agreement cannot form the basis for a finding of infringement. (A-807)

There was no evidence from which a jury could have found that LCC used the Lexington mark pre-2017 at its brick-and-mortar stores in a manner that did not

conform to the terms of the Settlement Agreement. Indeed, all uses of the Lexington mark cited by the trial court as support for the jury's findings of pre-2017 infringement were on the Internet or in print advertising. Exhibit DX-73 includes images of LCC's website and a magazine ad.[1] (SPA-16 (citing Ex. DX-73 (A-985))) And the trial court cites to testimony about Exhibit BO, which includes images of LCC's Facebook page and various pre-2017 Facebook posts by LCC. (SPA-16 (citing trial testimony addressing Ex. BO (A-1172-79)))

As there is no evidence that LCC used the Lexington mark at its stores in a manner contrary to the Settlement Agreement—no less in an infringing manner— LCC is not, as a matter of law, entitled to an award of profits based on sales at the stores. (SPA-1 (Judgment)) *Bus. Trends Analysts, Inc. v. Freedonia Grp., Inc.*, 887 F.2d 399, 407 (2d Cir. 1989) ("where an infringer's profits are not entirely due to the infringement, and the evidence suggests some division which may rationally be used as a springboard it is the duty of the court to make some apportionment"); McCarthy, § 30:65 at 30–130 (citing *Sheldon v. Metro–Goldwyn Pictures Corp.*, 309 U.S. 390 (1940), explaining that analysis used to apportion profits in copyright infringement context is useful to determine apportionment in trademark infringement cases); *Troublé v. Wet Seal, Inc.*, 179 F.Supp.2d 291, 305 (S.D.N.Y.

---

[1] Both LCC's website and ad prominently display the Lexington Clothing Co. mark, as required by the Settlement Agreement.

2001) ("If Wet Seal can prove that certain 'non-infringing elements' somehow contributed to the profits of the alleged infringing goods, it is entitled to deduct this from the profits it must disgorge to Troublé.").

Because the $1,641,963 in disgorgement of profits for infringement includes revenue from LCC's in-store, non-infringing sales from 2012 through 2021, this damages number is improperly overinclusive. (A-328-30 at 127:4-129:25; A-785-86 at 584:23-585:8) Damages properly apportioned for the sale of infringing goods by LCC prior to 2017 cannot exceed $212,605, which reflects the total amount of online-only sales by LCC prior to 2017. (A-970; A-974 (Exs. CK, PG))

## III. The evidence presented at trial does not support a finding of likelihood of confusion.

The evidence introduced by LFI at trial cannot support a finding of likelihood of confusion between LFI's Marks and LCC's use of Lexington—at the very least at retail stores where use was in conformance with the Settlement Agreement prior to 2017. The *Polaroid* factors to be considered by this Court are (1) the strength of the mark; (2) the similarity of the marks; (3) the proximity of the products; (4) the likelihood that the prior owner will bridge the gap; (5) actual confusion; (6) bad faith; (7) the quality of the products; and (8) the sophistication of consumers in the relevant market. *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). Application of these factors "is not mechanical, but rather focuses on the ultimate question of whether, looking at the products in their totality, consumers are

likely to be confused." *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 160 (2d Cir. 2016).

### a. LFI's Marks are weak and descriptive, and evidence fails to show that they have acquired secondary meaning.

"The strength of a mark depends . . . on its distinctiveness, or its origin-indicating quality, in the eyes of the purchasing public." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 457 (2d Cir. 2004). The strength of the mark analysis weighs "the distinctiveness of the mark, and while registered marks enjoy a presumption of distinctiveness . . . a registered mark may still be deemed weak." *Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d 260, 287 (S.D.N.Y. 2018). Both a mark's inherent distinctiveness and acquired distinctiveness (commercial strength through use and promotion) are relevant for determining the strength of a mark. *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 381 (2d Cir. 2005).

LFI's Lexington Marks are weak because: (1) they are geographically descriptive; (2) they have not acquired distinctiveness; (3) they are not the primary identifiers of LFI's products; and (4) there are myriad relevant third-party registrations incorporating the term Lexington.

### i The LFI Marks are geographically descriptive.

A mark that is descriptive of the geographic origin of a product or service is an inherently weak mark that is afforded only a narrow scope of protection. *Cont'l*

*Corrugated Container Corp. v. Cont'l Grp., Inc.*, 462 F. Supp. 200, 207-08 (S.D.N.Y. 1978); *see e.g.*, *Nat'l Auto. Club v. Nat'l Auto Club, Inc.*, 365 F. Supp. 879, 883 (S.D.N.Y. 1973), *aff'd*, 502 F.2d 1162 (2d Cir. 1974) (finding "NATIONAL" to be a "geographic term descriptive in nature" and therefore a weak mark); *Greenpoint Fin. Corp. v. Sperry & Hutchinson Co.*, 116 F. Supp. 2d 405, 409 (S.D.N.Y. 2000) (finding "GREENPOINT" to be descriptive of the geographic origin of the product).

LFI is based in Lexington, North Carolina, which is the location of its distribution and manufacturing facility as well as an epicenter of the U.S. furniture industry. (A-666-667 at 465:21-466:8) LFI explained the company is named Lexington because it was founded there. (A-664-65 at 463:2-464:22) And LFI conceded to the descriptiveness of the term Lexington when it asserted a claim of acquired distinctiveness in connection its U.S. Reg. No. 4379049 for the mark Lexington (in response to a refusal by the U.S. Patent and Trademark Office that Lexington is geographically descriptive).[2] (A-1180-87 (Ex. PX-B); *see also* McCarthy, § 15:68 (a claim of acquired distinctiveness is a concession that a mark is not inherently distinctive); *Montblanc-Simplo v. Aurora Due S.r.L.*, 363 F. Supp.

---

[2] The fact that the USPTO has accepted an applicant's claim of acquired distinctiveness does not compel the conclusion that the mark is indeed recognized as a source indicator; acquired distinctiveness must be proven by evidence at trial. *See Kohler Co. v. Bold Int'l FZCO*, 422 F.Supp.3d 681, 704 (E.D.N.Y. 2018); *Easy Spirit, LLC v. Skechers U.S.A, Inc.*, 515 F.Supp.3d 47, 61 (S.D.N.Y. 2021).

2d 467, 479 (E.D.N.Y. 2005) ("Montblanc's registration of the mark by proof of distinctiveness under Section 2(f) weighs against a finding of inherent distinctiveness."); *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 1577 (Fed. Cir. 1988) ("Where, as here, an applicant seeks a registration based on acquired distinctiveness under Section 2(f), the statute accepts a lack of inherent distinctiveness as an established fact.").

### ii LFI's evidence fails to establish that the LFI Marks have acquired secondary meaning.

A mark "has acquired a secondary meaning in its particular market [if] the consuming public primarily associates the term with a particular source." *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1040 (2d Cir. 1992). Courts consider six factors to determine secondary meaning: (a) consumer studies linking the mark to a source; (b) advertising expenditures; (c) unsolicited media coverage of the product; (d) sales success; (e) attempts to plagiarize the mark; and (f) the length and exclusivity of the mark's use. *Erchonia Corp. v. Bissoon*, 410 F. App'x 416, 418 (2d Cir. 2011). A plaintiff bears a "heavy" burden to prove its mark has acquired secondary meaning as it "entails vigorous evidentiary requirements." *20th Century Wear Inc., v. Sanmark-Stardust Inc.*, 747 F.2d 81, 90 (2d Cir. 1984).

"Surveys are the most persuasive element in demonstrating secondary meaning since such a survey can provide direct evidence on confusion as to origin."

16

*Ergoton, Inc. v. Hergo Ergonomic Support Sys.*, 1996 WL143903, at *8 (S.D.N.Y. 1996).

LFI did not introduce into evidence at trial any consumer survey addressing whether its marks had acquired secondary meaning or suggesting any consumer confusion between the parties' use of the Lexington mark.

Furthermore, notwithstanding LFI's claim that it had spent "over the last decade, $50 million," it failed to introduce any evidence to substantiate the purported expenditures other than a vague chart of yearly "marketing spend" for its furniture business as a whole, without indicating that the Lexington mark is used in the advertising; the chart allegedly showed spend for the Lexington Brand only, but did not distinguish or otherwise identify marketing expenditures allocable to the actual products at issue. (A-1188 (Ex. PX-PH); A-634 at 433:4-13; A-702 at 501:6-24) But proof of advertising alone fails to establish secondary meaning. *Eli Lilly & Co. v. Revlon, Inc.*, 577 F. Supp. 477, 482 (S.D.N.Y. 1983). And LFI failed to show that any such spending was linked to establishing secondary meaning. *See Braun, Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, n.22 (Fed. Cir. 1992) ($5.5 million in advertising expenditures was irrelevant where plaintiff "did not proffer evidence establishing that the advertising effectively created secondary meaning").

LFI similarly failed to introduce evidence of unsolicited media recognition of the specific marks by the media in connection with the LFI Marks. LFI relies on a

17

handful of allegedly "unpaid media coverage" and self-serving testimony regarding two appearances on ABC and NBC. (A-1189-90 (Ex. PX-MS); A-1191-93 (Ex. PX-NO); A-1194 (Ex. PX-NX); A-1195-1206 (Ex. PX-OK); A-624-25 at 423:18-424:14) But LFI did not establish (or even claim) that any such coverage was unsolicited. *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, 2020 WL 1673687, at *8 (S.D.N.Y. Apr. 6, 2020) (plaintiff bears the burden of proving coverage was unsolicited). Further, the media coverage in evidence, even if unsolicited, was outside the relevant time period—*i.e.*, after the date of alleged infringement began in 2012—and thus is irrelevant. *Sports Traveler, Inc. v. Advance Magazine Publishers, Inc.*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) (unsolicited media coverage which occurred after the date the infringement began "is irrelevant").

LFI claims to have generated $570 million under the "Lexington brand" and $1.2 billion under the Lexington Home Brands umbrella, but failed to introduce any evidence of this other than the same vague chart showing annual sales for LFI's business as a whole (which contradicts testimony and states there have been $491 million in sales). (A-1188 (Ex. PX-PH); A-634 at 433:17-24)

### iii     LFI Marks are not utilized as source identifiers.

LFI's evidence failed to establish that consumers associate its marks with the source of its products. *See Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*, 1996

WL 929597, at *12 (S.D.N.Y. Oct. 21, 1996) ("consumers will be less likely to associate a multifariously labeled product with a single source").

LFI markets and sells products under various collection brand names such as TOMMY BAHAMA, ARTISTICA HOME, BARCLAY BUTERA, and SLIGH—that have long been the names on LFI's products. (A-670 at 469:4-12) Indeed, LFI does not sell any furniture with only the Lexington name on it. (A-673 at 472:10-23; A-676-79 at 475:19-22, 476:9-20, 477:25-478:20)

The evidence submitted at trial thus reflects that it is only LFI's furniture collection names and licensed brands that are regarded by the public as the source of these products. This is especially true for its alleged household linens—the evidence reflects that, for example, bedding was labeled with a vendor name such as Eastern Accents, and LFI's Lexington Home Brands tag would only appear on the product at point of purchase. (A-680-83 at 479:22-482:14)

This supports a finding that the LFI Marks are weak as a matter of law because consumers are likely to recognize the source of such products as the brands themselves such as TOMMY BAHAMA, ARTISTICA HOME, BARCLAY BUTERA, and SLIGH– not as Lexington. *See* McCarthy, § 8.02[5] ("When a product . . . is sold by . . . plaintiff under several different word marks . . . it is more difficult for plaintiff to prove secondary meaning—that is, that the shape or design identifies a single source.").

19

### iv      Myriad third-party registrations underscore weakness of LFI Marks.

"[T]hird-party registration and use dilutes the strength of the trademark." *Franklin Res., Inc. v. Franklin Credit Mgmt. Corp.*, 988 F. Supp. 322, 328 (S.D.N.Y. 1997) (finding that third party use of the name "Franklin," as evidenced by telephone listings, diminished the strength of the plaintiff's mark despite the duration and volume of business); *Streetwise Maps*, 159 F.3d at 744 ("extensive third-party use of the term 'Vista,'. . . still serves to weaken [p]laintiff's mark despite the different nature of the other companies."); *The Trustees of Columbia University v Columbia/HC4 Healthcare Corp.*, 964 F. Supp. 733, 744-45 (S.D.N.Y. 1997) (finding third-party registrations for COLUMBIA, including in the healthcare field, diluted the strength of the mark).

The Lexington mark is diluted by more than 80 Lexington-formative marks on the Principal Register owned by third parties having no association with LFI. (A-684 at 483:2-6; A-690 at 489:3-5) These third-party registrations coexist with one another and with LFI's—in the marketplace, confirming that LFI's Lexington Marks are just a few among many similar marks and therefore entitled to a limited scope of protection solely in connection with LFI's registered goods and services. LCC's goods are outside the bounds of LFI's rights. As such, there was insufficient evidence to show the strength of LFI's mark; therefore, the first *Polaroid* factor weighs in LCC's favor.

20

### b. The parties' marks are not similar.

The fact that each of the parties' marks incorporates the word Lexington does not justify a finding of likelihood of confusion. "Similarity is a holistic consideration that turns on the marks' sight, sound, and overall commercial impression under the totality of the circumstances." *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 334 (S.D.N.Y. 2013). "[E]ven close similarity between two marks is not dispositive of the issue of likelihood of confusion." *Savin*, 391 F.3d at 458.

LCC's Flag Logo () is the dominant element in the LCC Marks and is what first catches the eyes of prospective purchasers. (A-694-95 at 493:25-494:3) The evidence introduced by LFI at trial unequivocally confirms that LCC's advertising materials and packaging prominently display the Flag Logo (and "Lexington Clothing Co." in certain images, such as those depicting LCC storefronts). *Id.* There can be little doubt that the first, and most compelling, impression conveyed by the LCC Marks is the Flag Logo. *Trustees of Columbia University*, 964 F. Supp. at 745-46 (explaining that marks become more distinguishable when used in conjunction with distinctive logos and such logos decrease the likelihood of confusion). Moreover, it is undisputed that all of LCC's retail stores had the Lexington Clothing Co. mark on the storefronts as required by the Settlement Agreement. (A-1169-1171 (Ex. DX-69); A-401-02 at 200:6-201:16)

By contrast, LFI's advertising materials show that the LFI Marks appear in a distinguishable stylized format:







(A-1207-86 (Ex. PX-M); A-1287-1301 (Ex. PX-N); A-1302-30 (Ex. PX-CI); A-1331-33 (Ex. PX-LP); A-1334 (Ex. PX-MW); A-1335-36 (Ex. PX-PF))  There is no

evidence that the marks "create the same overall impression"; rather, "their appearance . . . is unlikely to confuse consumers." *Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 491 (S.D.N.Y. 2004) (no similarity where defendant's mark is "almost always accompanied by" a logo while plaintiff's mark "lacks an accompanying picture" and "usually appears in a font that differs from defendants' font"); *see also Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC*, 335 F. Supp. 3d 566, 585 (S.D.N.Y. 2018) (differences in presentation of marks "create a vastly different impression on the viewer," making confusion "unlikely").

Nor do the parties' marks bear a similar connotation. LCC's marks convey imagery of the American Revolutionary War and historical New England traditions—an "American" theme that transcends the word encompassed within the Flag Logo. (A-316-317 at 115:5-12, 116:4-8) The Lexington component in LCC's marks reinforces this American theme because of the strong association with the City of Lexington, Massachusetts, the Revolutionary War, and the birth of America. (A-316-317; *see also* A-335 at 134:12-17) While LFI claims it is a century-old American company, its age and the fact that it was founded in America does not compel the conclusion that it is perceived by consumers as an "all-American" company, especially in the absence of a survey or consumer testimony. Rather, the LFI Marks are merely descriptive of the LFI distribution location. This factor

weighs in favor of LCC because there is insufficient evidence as to similarity of the marks as a matter of law.

### c. The parties' products are not proximate and LFI presented no evidence of bridging the gap.

The third and fourth *Polaroid* factors address "the degree to which the [parties'] products currently compete with each other and are likely to compete with each other in the future." *Medici Classics Prods., LLC v. Medici Grp., LLC*, 683 F. Supp. 2d 304, 311-12 (S.D.N.Y. 2010). The inquiry "determine[s] whether the two products have an overlapping client base that creates a potential for confusion." *Brennan's*, 360 F.3d at 134; *see also Savin*, 391 F.3d at 439 (a court may consider whether the products differ in content, geographic distribution, market position and audience appeal).

The evidence confirms that the parties are not competitors and are unlikely to compete with each other in the future. (A-695-96 at 494:11-495:13) LFI admitted LCC is not a competitor, and identified as competitors companies primarily operating in the furniture industry. *Id.* LFI touts itself as a "well-known and highly respected manufacturer, distributor, and retailer of high-end furniture in the United States." (A-77, A-88 (Am. Compl.) at ¶¶ 36, 97) Accordingly, the LFI Marks are all registered in connection with furniture products and services. (A-655-57 at 454:2-456:16)

24

LFI claims "market proximity" because both parties sell "home linens and décor"—specifically, pillows and bedding products. But the fact that both parties sell pillows and bedding does not overcome the fact that LCC's offerings are not competitive with the bulk of LFI's furniture offerings. *See Mejia*, 920 F. Supp. at 548 (finding improper attempts "[t]o escape the seemingly obvious conclusion that the bulk of plaintiff's services are not competitive with defendant's"). The evidence at trial reflects that any pillows and bedding sold by LFI are ancillary to and complement its furniture, and (unsurprisingly) comprise a miniscule fraction of LFI's annual sales. (A-705-06 at 504:4-505:3)

Finally, there is no geographic proximity between the parties' businesses; it is undisputed that the parties do not have overlapping locations. Due to declining sales and large losses, LCC closed its last brick and mortar store in the U.S. in December 2019. (A-295 at 94:19-22) And LFI does not sell products online through its company website as LCC does. (A-673-74 at 472:16-473:6; A-718-19 at 517:22-518:3) As such, there is no evidence in the trial record to support that the parties offer products proximate to one another.

### d. LFI presented no evidence of actual confusion.

Actual confusion is typically demonstrated "through the use of consumer surveys or polls or through evidence of 'a diversion of sales, damage to goodwill, or loss of control over reputation.'" *Miss Universe, LP v. Villegas*, 672 F. Supp. 2d

575, 588-89 (S.D.N.Y. 2009) (*quoting Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991)); *see also Sly Magazine LLC*, *v. Welder Publications LLC*, 529 F. Supp. 2d 425, 441 (S.D.N.Y. 2007) (finding evidence of 100 email requests to defendant insufficient because "[n]o evidence links the confusion evinced by the emails or statements to any potential or actual effect on customers' purchasing decisions"). Indeed, "the absence of surveys is evidence that actual confusion cannot be shown." *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 964 (2d Cir. 1996).

LFI introduced no consumer surveys or studies evidencing consumer confusion. (A-669 at 468:15-23) Instead, LFI relied on hearsay statements by unidentified individuals, but LFI presented no evidence linking those statements to lost sales, lost reputation, or damage to goodwill. Specifically, LFI proffered testimony from an LFI Assistant Showroom Manager, an interested witness, who testified that two women entered the store in 2019 asking for clothing, but LFI personnel did not take their names or any information about the witnesses, and never saw the witnesses again. (A-525-26 at 324:7-325:4) LFI also offered unsubstantiated testimony from an unidentified number of designers who attended an event in 2018 and claimed they had visited an East Hampton LCC store that they believed to be LFI's. (A-567-68 at 366:9-367:23)

This type of uncorroborated evidence is insufficient to support a finding of confusion.  *See, e.g.*, *Star Indus., Inc.*, 412 F.3d at 388 (dismissing infringement claims where "Star's evidence of actual confusion consisted entirely of testimony by several interested witnesses recounting a handful of anecdotes, including a number of hearsay statements by unidentified and unidentifiable declarants.").  But even if LFI's evidence constitutes actual confusion, a handful of instances over an eleven-year period are clearly *de minimis* and should be accorded little, if any, weight.  *See Disney Enterprises, Inc. v. Sarelli*, 322 F. Supp. 3d 413, 435 (S.D.N.Y. 2018) (if relying on anecdotal evidence, a plaintiff must show "a probability of confusion . . . affecting *numerous* ordinary prudent purchasers"); *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001) (finding de minimis evidence of actual confusion failed to establish a genuine issue of material fact as to likelihood of confusion).  This factor thus weighs heavily in favor of LCC.

### e.  LFI presented no evidence of bad faith.

LFI did not introduce any evidence of bad faith on the part of LCC.  This factor addresses "whether the defendant adopted [plaintiff's] mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product."  *Bath & Body Works Brand Mgmt., Inc. v. Summit Entm't, LLC*, 7 F. Supp. 3d 385, 397 (S.D.N.Y. 2014); *see also Lang*, 949 F.2d at

584 (rejecting the argument that prior knowledge of another's mark gives rise to an inference of bad faith).

The evidence demonstrates that LCC believed it was complying with the Settlement Agreement in the U.S. market. (A-273-74 at 72:24-73:1; A-296 at 95:4-23; A-298 at 97:9-23; A-398 at 197:8-16; A-437 at 236:12-16) Although LFI claims LCC was on notice of potential infringement, the evidence is clear that LFI never pursued its early allegations of the same after sending two cease and desist letters over the course of seven years. (A-985 (Ex. DX-73)) Simply put, there is no evidence in the trial record that LCC adopted the LCC Marks with the intent to trade on the LFI Marks or tread into the field of furniture. The lack of evidence in the trial record demonstrating bad faith means this factor weighs in LCC's favor.

### f. The evidence of quality of products and sophistication of consumers do not support a finding of likelihood of confusion.

"[C]onfusion is less likely where goods are expensive and are purchased after careful consideration than where they are purchased casually." McCarthy § 23:96; *see Gross v. Bare Escentuals Beauty Inc.*, 641 F. Supp. 2d 175, 192 (S.D.N.Y. 2008) ("The greater the value of an article the more careful the typical consumer can be expected to be."). The evidence at trial confirmed it is undisputed that the parties' products are of comparable quality, that is, expensive and high-end. (A-259-260 at 58:16-59:2; A-782 at 581:10-12) The consumers of each party were described as

affluent, highly educated, and/or sophisticated. (A-295 at 94:14-18; A-672 at 471:1-3; A-709 at 508:20-22)

A conclusion about consumer sophistication may be "based solely on the nature of the product or its price." *Star Indus., Inc.*, 412 F.3d at 390. The evidence confirms both parties' products are expensive; certain LFI sofas cost between $3,000 and $4,700 with other furniture ranging from $400 to $11,000. (A-1337-47 (Ex. PX-AD); A-1302-30 (Ex. PX-CI)) LCC's product are likewise expensive, charging in the hundreds of dollars for one shirt. (A-259-60 at 58:6-59:2 (confirming LCC sells "decorative pillows" "at a premium price")) "Because people generally exercise greater care in purchasing expensive products than in purchasing cheap products, purchasers of expensive products are usually less likely to be confused." *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 326 (S.D.N.Y. 2000); *see also LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 676 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017) (inferring sophisticated consumers "from the high price point of its sneakers"). This factor weighs in LCC's favor.

Balancing the evidence—and lack of evidence—it is clear that the evidence does not, as a matter of law, support a finding that there is a likelihood of confusion between LCC's and LFI's marks, at the very least for in store sales prior to 2017.

## IV. The district court erred in awarding a disgorgement of profits without considering equitable factors.

29

Even if the jury's finding of infringement stands, that finding does not entitle LFI to a monetary award as of right under the Lanham Act. Any money award under the Lanham Act is within the discretion of the court. *See George Basch Co. v. Blue Coral Inc.,* 968 F.2d 1532, 1537 (2d Cir. 1992) ("the statute's invocation of equitable principles as guideposts in the assessment of monetary relief vests the district court with some degree of discretion in shaping that relief"; in trademark cases, "both damage and profit awards may be assessed 'according to the circumstances of the case'") (quoting 15 U.S.C. § 1117(a)); *see also Carl Zeiss Stiftung v. VEB Carl Zeiss Jena,* 433 F.2d 686, 706 (2d Cir. 1970) (the Lanham Act's authorization of damages and defendant's profits "does not mean that a successful plaintiff is entitled in all case to a monetary award in addition to injunctive relief. The award for damages 'is subject to the principles of equity.'").

In considering principles of equity, this Court has held that, before disgorgement of profits can be awarded under the Lanham Act, a district court should weigh five factors: "(1) the degree of certainty that the defendant benefited from the unlawful conduct; (2) availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the infringement; (4) plaintiff's laches; and (5) plaintiff's unclean hands." *George Basch Co.*, 968 F.2d at 1540. "The district court's discretion lies in assessing the relative importance of these factors and determining whether, on the whole, the equities weigh in favor of an

accounting."  *Id.*; *see also Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020) (noting that district courts in equity practice "have often considered a defendant's mental state, among other factors, when exercising their discretion in choosing a fitting remedy").

In this case, the district court failed to consider any of the factors identified by this Court in *George Basch Co.*  Following the jury's verdict, the district court entered judgment without any explanation as to why disgorgement was appropriate under the circumstances.  (SPA-1)  The district court's failure to supplement the jury verdict with its own findings of fact using the *George Basch* factors constitutes legal error.  Even in its order on LCC's Rule 59(e) Motion to alter or amend the Judgment, the district court did not consider, let alone mention, the *George Basch* factors.  (SPA-2-26)  Instead, the district court stated that LCC "forfeited any right it may have had to have the disgorgement remedy tried to the Court" because it failed to object to LFI's jury demand.  (SPA-11)  But that determination is erroneous for three reasons.

**First**, as an equitable remedy, disgorgement was not covered by LFI's demand for "a jury trial on all issues so triable."  (A-90-91)  Rule 38 confirms that a jury demand is limited to "any issue triable **of right** by a jury."  Fed. R. Civ. P. 38(b) (emphasis added).  "The remedy of an accounting and disgorgement of profits for trademark infringement is equitable in nature and has long been considered that

31

way." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 132 (2d Cir. 2014) (recognizing "the longstanding treatment of an accounting of *profits* as an equitable remedy") (emphasis in original); *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1348 (11th Cir. 2019) (holding "that a plaintiff seeking the defendant's profits in lieu of actual damages is not entitled to a jury trial"). Because LFI's general jury demand did not cover the equitable remedy of disgorgement, LCC's "silence" on this issue could not "amount[] to consent to a binding jury verdict on the disgorgement damages." (SPA-13)

**Second**, even if LFI demanded a jury on the issue of disgorgement, Rule 39(c)(2) requires the consent of both parties before a court may give binding effect to a jury verdict on an issue not triable as of right. Fed. R. Civ. P. 39(c)(2). LCC never consented to the jury deciding whether LFI was entitled to the equitable remedy of disgorgement. In support of its finding to the contrary on LCC's Rule 59(e) Motion, the district court relied on this Court's observation in *Broadnax v. City of New Haven*, 415 F.3d 265, 272 (2d Cir. 2005), that, "where a party requests a jury determination of an issue requiring no special competence or authority belonging solely to the court, and the other party or parties fail to object, such silence may be deemed 'consent' under Rule 39(c)." (SPA-13) The district court's reliance on *Broadnax* was error.

This Court's holding in *Broadnax* was limited: "[W]e hold that when a party demands jury **consideration of lost wages under Title VII** and the party's opponent fails to object, Rule 39(c) permits the district court to submit the lost wages issue for a non-advisory jury determination." *Broadnax*, 415 F.3d at 272 (emphasis added). Obviously, this is not a Title VII case, so the holding in *Broadnax* is inapposite. But more importantly, whether a party is entitled to the equitable remedy of disgorgement of profits under the Lanham Act (in addition to an injunction) requires exactly the kind of "special competence" that this Court found was not necessary to calculate lost wages under Title VII. *Id.* Indeed, whether disgorgement is appropriate, and the amount of any such disgorgement, is not a formulaic mathematical exercise; it is a "highly discretionary calculation[] that take[s] into account multiple factors." *Tull v. United States*, 481 U.S. 412, 427 (1987). The five factors from *George Basch Co.*, discussed above make this exactly "the kind[] of calculation[] traditionally performed by judges." *Id.* Accordingly, this is not a case where the court can rely on a party's silence for consent to a binding jury verdict on an equitable remedy.

**Third,** whether disgorgement is appropriate, and the amount of disgorgement to be awarded, is an issue squarely reserved for the district court. Under the Lanham Act, a disgorgement of profits is "subject to the principles of equity," and "[i]f the court shall find that the amount of the recovery based on profits is either inadequate

33

or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a). The Second Circuit has further vested district courts with "discretion [] in assessing the relative importance of these factors and determining whether, on the whole, the equities weigh in favor of an accounting." *George Basch Co.*, 968 F.2d at 1540.

Because the district court awarded disgorgement without considering the factors identified in *George Basch*, the judgment should be vacated and remanded for further proceedings.

## V. The punitive damages award should be reversed.

### a. Punitive damages were not legally available absent an award of actual damages.

The district court committed legal error by awarding punitive damages absent an award of actual damages, which is a prerequisite for punitive damages under New York law. As this Court has made clear, "the Lanham Act does not authorize an additional award of punitive damages for willful infringement of a registered trademark." *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 113 (2d Cir. 1988); *MyPlayCity, Inc. v. Conduit Ltd.*, 2012 WL 1107648, at *25 (S.D.N.Y. Mar. 30, 2012), *adhered to on reconsideration*, 2012 WL 2929392 (S.D.N.Y. July 18, 2012) (punitive damages are not authorized under the Lanham

Act); *Major League Baseball Props., Inc. v. Opening Day Prods., Inc.*, 1997 WL 525482, at *5 (S.D.N.Y. Aug. 22, 1997) (same).

Accordingly, punitive damages were only available to LFI on its unfair competition claim under New York law. (A-861 at 626:23-25 ("Now, you may, but you are not required to award punitive damages for plaintiff's New York common law unfair competition claim.")) Before punitive damages can be awarded, however, New York law first requires "a showing of **actual injury** which would justify an award of **actual or compensatory damages**." *Ebker v. Tan Jay Int'l Ltd.*, 741 F. Supp. 448, 472 (S.D.N.Y. 1990) (emphasis added), *aff'd sub nom. Ebker v. Tan Jay*, 930 F.2d 909 (2d Cir. 1991) (citing *Gill v. Montgomery Ward & Co.*, 284 A.D. 36, 41 (3d Dep't, 1954)); *Maier-Schule GMC, Inc. v. General Motors Corp.*, 850 F. Supp. 1095, 1104 (W.D.N.Y. 1994) ("[P]laintiff failed to establish its actual or compensatory damages . . . . Therefore, punitive damages are now unavailable to plaintiff."), *aff'd*, 62 F.3d 1412 (2d Cir. 1995).

Despite this legal requirement, the district court entered a punitive damages judgment without any finding that LFI suffered actual harm. Indeed, there was no award of actual damages. (SPA-1) Contrary to the district court's holding on LCC's post-trial motion, "the jury's award of disgorgement of profits" cannot provide the required "proof of the actual harm to LFI that supports the award of punitive damages." (*See* SPA-20) While disgorgement "constitute[s] compensation and not

35

a penalty," 15 U.S.C. § 1117(a), an accounting of the defendant's profits is not necessarily reflective of the plaintiff's actual losses.  That is true here, where LFI sought to recover "disgorgement of Defendant's profits from their home goods here in the United States," (A-785-86 at 584:24-585:1), without showing that this amount corresponded to any loss actually suffered by LFI.  *See E.J. Brooks Co. v. Cambridge Sec. Seals*, 105 N.E.3d 301, 308-09 (N.Y. 2018) (where a plaintiff claims that disgorgement is a proxy for its actual damages, the plaintiff has the burden to show that the defendant's gain "correspond[ed]" to "what the plaintiff has lost").

Because LFI did not demonstrate "some approximate relation of correspondence, a causal relation not wholly unsubstantial and imaginary, between the gains of [LCC] and those diverted from [LFI]," the jury's disgorgement award cannot be considered an award of actual or compensatory damages.  *See id.; see also Hubbell v. Trans World Life Ins. Co. of N.Y.*, 408 N.E.2d 918, 919 (N.Y. 1980) ("[A]bsent a valid claim for compensatory damages, there could be none for punitive damages").

In fact, LFI never sought to recover compensatory damages at all.  (A-647 at 446:5-7 ("[T]here is no claim for damages in this case other than a claim by the plaintiff for what's called disgorgement of profits earned by the defendant.")) Accordingly, no finding was made by the jury that the examples of "actual harm" provided by the district court in its Order rejecting LCC's Rule 59(e) Motion—two

customers who visited an LFI showroom thinking it was hosted by LCC and "several designers" who expressed that they were not interested in purchasing LFI's products or visiting LFI's showroom after those designers had visited an LCC store and concluded that the offerings were "just not [their] look," (SPA-21 (quoting A-522-23, A-565-68), would justify an award of actual or compensatory damages. Accordingly, the punitive damages award should be reversed.

### b. There was no evidence that LCC engaged in conduct amounting to gross, wanton, or willful fraud, or other morally culpable conduct to an extreme degree.

The punitive damages award should be reversed for the independent reason that it is not justified by the circumstances of this case. Punitive damages are only warranted where there is evidence that "a defendant's conduct has constituted gross, wanton, or willful fraud or other morally culpable conduct to an extreme degree." *Getty Petroleum Corp.*, 878 F.2d at 657 (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 371 (2d Cir.1988)) (internal quotations omitted).

The jury had no basis to find that LCC's "conduct was extreme to the degree that would make an award of punitive damages appropriate here." *L & L Wings, Inc. v. Marco-Destin Inc.*, 756 F. Supp. 2d 359, 367 (S.D.N.Y. 2010); *see also Marinaccio v. Town of Clarence*, 986 N.E.2d 903, 906 (N.Y. 2013) ("[T]he standard for imposing punitive damages is a strict one and punitive damages will be awarded only in exceptional cases."). As noted above, the evidence demonstrates that LCC

37

believed it was complying with the Settlement Agreement in the U.S. market.  (A-273-74 at 72:24-73:1; A-296 at 95:4-23; A-298 at 97:9-23; A-398 at 197:8-16; A-437 at 236:12-16)  And the so-called bad faith conduct identified by the district court in the Order—that LCC entered the U.S. market with knowledge of LFI's trademark and used infringing marks on social media accessible to U.S. consumers and "on certain pillows that falsely claimed that [LCC] owned a registered trademark for the phrase 'Lexington Company,'" (SPA-7), is hardly the gross, wanton, or willful fraud or other morally culpable conduct that is required for punitive damages under New York law.  *E.g.*, *L & L Wings, Inc.*, 756 F. Supp. 2d at 368 (denying request for punitive damages despite "the Court's finding that Defendants willfully infringed on Plaintiff's Mark"); *Maier-Schule GMC, Inc. v. General Motors Corp.*, 850 F. Supp. at 1104 (punitive damages unavailable where plaintiff failed to put forward facts "evincing fraud or other morally culpable conduct").

In this absence of actual or compensatory damages or any evidence of morally culpable conduct, the Court should reverse the jury's punitive damages award.

## CONCLUSION

For the foregoing reasons, the Court should vacate the Judgment, reverse the Order denying LCC's Rule 59(e) Motion and issue an order finding there is no likelihood of confusion.  In the alternative, the Court should vacate the award of

disgorgement, and reverse the award of punitive damages, and award such other and

further relief as this Court deems just and proper.

Dated: March 13, 2023

Respectfully submitted,

**BLANK ROME LLP**

By: */s/ Timothy D. Pecsenye*
    Timothy D. Pecsenye
One Logan Square
30 North 18th Street
Philadelphia, PA 19103
Tel: 215.569.5619
Fax: 215.832.5619
Email: pecsenye@blankrome.com

*Attorneys for Defendant-Appellant*
*The Lexington Company, AB d/b/a/*
*The Lexington Clothing Company*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts exempted by Fed. R. App. P. 32(f), the brief contains 8,665 words.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(b) because the brief has been prepared in Microsoft Word 2019, using 14-point Times New Roman font, a proportionally spaced typeface.

Dated: March 13, 2023

By: */s/ Timothy D. Pecsenye*
Timothy D. Pecsenye

*Attorneys for Defendant-Appellant*
*The Lexington Company, AB d/b/a/*
*The Lexington Clothing Company*

40

# Special Appendix

**i**

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

|  | Page |
|---|---|
| Judgment, dated June 2, 2022................................... | SPA-1 |
| Opinion and Order of the Honorable P. Kevin Castel, dated October 24, 2022............................. | SPA-2 |

SPA-1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
LEXINGTON FURNITURE INDUSTRIES, INC.
d/b/a LEXINGTON HOME BRANDS,

                Plaintiff,                    19 **CIVIL** 6239 (PKC)

         -against-                         **JUDGMENT**

THE LEXINGTON COMPANY, AB d/b/a THE
LEXINGTON CLOTHING COMPANY,
                    Defendant.
-------------------------------------------------------------X

       It is hereby **ORDERED, ADJUDGED AND DECREED:** That after a Jury

Trial before the Honorable P. Kevin Castel, United States District Judge, Plaintiff Lexington

Furniture Industries, Inc. d/b/a Lexington Home Brands has judgment in the amount of $1.00

for nominal damages, $1,641,963 for damages and $925,000 for punitive damages for a total

damage award of $2,566,964 as against the Defendant The Lexington Company, AB d/b/a

The Lexington Clothing Company.

**DATED:** New York, New York
           June 2, 2022

                                 **RUBY J. KRAJICK**
                                 _____
**So Ordered:**                           **Clerk of Court**

                                  **BY:**   K. Mango
_____          _____
       **U.S.D.J.**                                **Deputy Clerk**

SPA-2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
LEXINGTON FURNITURE INDUSTRIES, INC.
d/b/a LEXINGTON HOME BRANDS,

                         Plaintiff,                    19-cv-6239 (PKC)

       -against-                           OPINION
                                            AND ORDER

THE LEXINGTON COMPANY, AB d/b/a THE
LEXINGTON CLOTHING COMPANY,

                         Defendant.
-------------------------------------------------------------x

CASTEL, U.S.D.J.

           Plaintiff Lexington Furniture Industries, Inc. ("LFI") brought this action against

defendant The Lexington Company, AB ("LCC") asserting Lanham Act and state statutory and

common law claims.  The action is part of an approximately fifteen-year dispute between the

parties regarding the use of certain trademarks.  After an extensive discovery period and

energetic motion practice, this action was tried before a jury from May 26, 2022, to June 2, 2022,

on the Lanham Act claim, state law unfair competition claim and breach of contract claim.  The

jury returned a verdict finding in favor of LFI on all its claims, including that LCC's

infringement was willful.  It awarded LFI damages: $1,641,963 in disgorgement of profits on the

Lanham Act claim, $925,000 in punitive damages on the state common law claim and one dollar

in nominal damages on the breach of contract claim.  (Doc 212.)

           Now the parties bring post-trial motions.  LCC moves for (i) entry of judgment as

a matter of law in favor of LCC dismissing all of LFI's claims, pursuant to Rule 50(a), Fed. R.

Civ. P.; and (ii) an alteration or amendment of the judgment awarded in favor of LCI, pursuant to

Rule 59(e), Fed. R. Civ. P.  For its part, LFI opposes LCC's motions and brings its own motions

SPA-3

for (i) a permanent injunction enjoining further trademark infringement by LCC; (ii) taxable costs; and (iii) non-taxable costs and attorneys' fees.  For reasons to be explained, LCC's motions for judgment as a matter of law and to alter the judgment will be denied.  LFI's motion for a permanent injunction will be granted.  The Court will address LFI's motion for attorneys' fees and costs in a later opinion and order.

The Court assumes familiarity with the procedural history of the action as recounted in its Opinion and Order on the pre-trial summary judgment motions.  Lexington Furniture Indus., Inc. v. Lexington Co., AB, No. 19-cv-6239, 2021 WL 1146276 (S.D.N.Y. Mar. 23, 2021).

## I.   LCC'S MOTION FOR JUDGMENT AS A MATTER OF LAW WILL BE DENIED.

LCC renews its motion for judgment as a matter of law dismissing all claims asserted by LFI, pursuant to Rule 50(a), Fed. R. Civ. P.  The three claims that proceeded to trial were a Lanham Act claim for trademark infringement, a state common law claim for unfair competition,[1] and a breach of contract claim premised upon a prior settlement agreement between the parties.  LCC urges that the doctrine of laches bars LFI's claims.  In a separate motion to amend or modify the judgment, it also urges that there was insufficient evidence to support a finding of likelihood of confusion.  Though nominally asserted by LCC under Rule 59(e), Fed. R. Civ. P., the Court considers this argument as if made under Rule 50(a).

A court may only grant a motion for judgment as a matter of law "if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so

---

[1] The claim was pled as two claims for common law unfair competition and common law trademark infringement.  On the facts of this case, they were treated by the parties as essentially one claim that mirrored the elements of the Lanham Act claim.  (May 27, 2022 Tr. at 175-76.)

overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against

[it]."  Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133 (2d Cir. 2008) (quoting Luciano v.

Olsten Corp., 110 F.3d 210, 214 (2d Cir. 1997)) (internal quotations omitted) (alterations in

original).  "Under Rule 50, judgment as matter of law is appropriate where there is no legally

sufficient evidentiary basis for a reasonable jury to find for a party . . . .  [A] court may properly

grant judgment as a matter of law where viewed in the light most favorable to the nonmoving

party, the evidence is such that, without weighing the credibility of the witnesses or otherwise

considering the weight of the evidence, there can be but one conclusion as to the verdict that

reasonable men could have reached."  Merrill Lynch Interfunding, Inc. v. Argenti, 155 F.3d 113,

120 (2d Cir. 1998) (quoting Samuels v. Air Transp. Local 504, 992 F.2d 12, 14 (2d Cir. 1993))

(internal quotations and citations omitted).  "In ruling on a motion for judgment as a matter of

law, [a court] must view the evidence in a light most favorable to the non-movant and grant that

party every reasonable inference that the jury might have drawn in its favor."  Id. at 120-121

(internal quotations omitted).

A.  A Reasonable Jury Could Find a Likelihood of Confusion.

The Court will first address LCC's claim that the jury verdict must be vacated

because the evidence at trial was insufficient as a matter of law to establish customer confusion.

Viewing the trial evidence in a light most favorable to LFI and drawing all reasonable inferences

in favor of LFI as is required on a motion for judgment as a matter of law, a reasonable jury

could conclude that there was a likelihood of consumer confusion based on the trial evidence.

LCC appeals to the familiar factors set forth in Polaroid Corporation v. Polarad

Electronics Corporation, 287 F.2d 492 (2d Cir. 1961), and argues that LFI failed to prove

consumer confusion as a matter of law because (i) LFI's marks are weak, descriptive and lack

secondary meaning, (ii) LCC's marks are not similar to LFI's marks, (iii) LFI's products are not

proximate to LCC's products, (iv) there was no evidence of actual confusion, (v) there was no

evidence of LCC's bad faith, and (vi) the parties' products are of similar quality and are

purchased by sophisticated consumers.

  "The application of the <u>Polaroid</u> test is 'not mechanical, but rather, focuses on the

ultimate question of whether, looking at the products in their totality, consumers are likely to be

confused.'" <u>Starbucks Corp. v. Wolfe's Borough Coffee, Inc.</u>, 588 F.3d 97, 115 (2d Cir. 2009)

(quoting <u>Star Indus., Inc. v. Bacardi & Co.</u>, 412 F.3d 373, 384 (2d Cir. 2005)). The <u>Polaroid</u> test

"is a fact-intensive inquiry that depends greatly on the particulars of each case." <u>Kelly-Brown v.</u>

<u>Winfrey</u>, 717 F.3d 295, 307 (2d Cir. 2013). The Court reviews the evidence in support of the

factors to the extent its sufficiency is challenged by LCC.

  <u>Strength of LFI's mark.</u> LCC claims that the marks are geographically

descriptive, lack secondary meaning, are not source-identifying, and are diluted from third-party

registrations. Though LFI was founded in Lexington, North Carolina, (May 31, 2022 Tr. at 463-

64), there was also testimony that Lexington, North Carolina is not famous for furniture, (<u>id.</u> at

465). LFI presented evidence of its advertising investments, unsolicited media coverage, and its

use of the Lexington name in connection with its furniture business for over 100 years. (May 27,

2022 Tr. at 329-30; May 31, 2022 Tr. at 421-433.) There was testimony that consumers

associated LFI's named collections with the general LFI or Lexington brand, (May 31, 2022 Tr.

at 470, 476), and that "Lexington" is used as the primary source identifier on LFI's products and

in its advertising, (May 27, 2022 Tr. at 253-54, 318-19, 338-40; May 31, 2022 Tr. at 406-12).

Robert Stamper also testified that he was not worried about other third parties that use

"Lexington" in connection with their products because, unlike LCC, those third parties were not

using "Lexington" in connection with the sale of furniture or home goods.  (May 31, 2022 Tr. at 483-84, 489, 492.)  While neither party offered into evidence any consumer survey regarding secondary meaning,[2] the jury could have reasonably concluded that LFI's marks are strong based on the totality of evidence presented.

Similarity of the Marks.  Both LFI and LCC use the word "Lexington" in their marks, including in LCC's flag logo.  And further evidence was presented that LCC has used the word "Lexington" on marks other than the flag logo.  (See, e.g., Pl. Exs. AF, DG, FI, FK, GQ.)  It is far from unreasonable to conclude that the parties' marks are similar.

Proximity of the Products.  Tommy Lindhe testified that LCC sells home textiles, bedding, towels, pillows, and pillowcases, which directly compete with LFI's home goods offerings.  (May 26, 2022 Tr. at 58; May 27, 2022 Tr. at 196, 230-31, 279, 317, 330.)  LFI also presented evidence as to the close relationship between furniture and home textiles.  (May 26, 2022 Tr. at 61-62; May 27, 2022 Tr. at 253.)

Actual Confusion.  Three witnesses testified to instances of actual customer confusion.  Patricia Rogers testified that in fall 2019 two customers became frustrated after arriving at an LFI showroom that they had confused for an LCC store.  (May 27, 2022 Tr. at 320-21.)  Robert Stamper testified that in summer 2018 at a home goods exposition several designers told Stamper that they were not interested in purchasing LFI's products or visiting LFI's showroom because those designers had previously visited an LCC store and concluded that the offerings there – which they mistook for LFI's offerings – were "just not [their] look."  (May 27, 2022 Tr. at 364-67.)  And Tommy Lindhe testified that he was aware that Barclay Butera, a

---

[2] A consumer survey may serve as potent proof of the likelihood of confusion but is not required to make out a case under the Lanham Act. See Guthrie Healthcare Sys. v. ContextMedia, Inc., 826 F.3d 27, 45 (2d Cir. 2016) (affirming in part the grant of a permanent injunction after a bench trial).

partner of LFI, "mixed up the two companies" when trying to tag LFI in an Instagram post. (May 26, 2022 Tr. at 111-12.)

Bad Faith.  LCC knew of LFI's trademarks before entering the U.S. market. (May 26, 2022 Tr. at 67-68.)  "Bad faith may be inferred from the junior user's actual or constructive knowledge of the senior user's mark."  Star Indus., 412 F.3d at 389.  There was also testimony that despite this knowledge, LCC continued to use infringing marks, including on its social media accounts that could be accessed by U.S. customers and on certain pillows that falsely claimed that LCC owned a registered trademark for the phrase "Lexington Company." (May 26, 2022 Tr. at 89-90; May 31, 2022 Tr. at 416-18.)

Quality of the Products and Sophistication of Consumers.  The parties agree that their products are of similar quality and price and that their consumers are generally affluent, educated and sophisticated.  This generally weighs in favor of LCC, as sophisticated consumers typically exercise great care when purchasing expensive products.  Nevertheless, the Polaroid factors are considered in their totality and no one factor is determinative; the jury was free to weigh this factor against the other factors as it deemed appropriate.

Considering the totality of the evidence, a reasonable jury could conclude comfortably that LFI had proven a likelihood of consumer confusion.  LCC has not met the high burden of showing that no reasonable jury could conclude that there was a likelihood of confusion based on the evidence presented at trial.  Accordingly, LCC's motion for a judgment as a matter of law on this ground will be denied.

B.  Laches Does Not Bar Any Claim.

LCC argues that LFI's claims are barred by the doctrine of laches.  LFI asserts that the jury's finding that LCC's infringement was willful forecloses the defense and the Court

6

agrees.  The jury was instructed that the defendant's infringement "is 'willful' if (1) the defendant was actually aware of the infringing activity, or (2) the defendant's actions were the result of reckless disregard or willful blindness."  The jury expressly found that LCC's trademark infringement was "willful," (Doc 212 at 1), and that its conduct on the state common law claim warranted punitive damages, (Doc 212 at 2).  The evidence at trial was that prior to entering the U.S. market, LCC knew of LFI's trademarks.  (May 26, 2022 Tr. at 67-68.)  Indeed, LFI had succeeded in having LCC's trademark cancelled by the U.S. Patent and Trademark Office.  (Id. at 63-66.)  Before entering the U.S. market, LCC entered into a settlement with LFI restricting LCC's use of the Lexington name in certain circumstances.  (Id. at 63-68.)  This was the settlement agreement that the jury found LCC had breached.  (Doc 212 at 1.)

"It is well established that 'laches is not a defense against injunctive relief when the defendant intended the infringement.'"  Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107 (2d Cir. 2000) (quoting Harlequin Enters. Ltd. v. Gulf & W. Corp., 644 F.2d 946, 950 (2d Cir. 1981)).  "This good-faith component of the laches doctrine is part of the fundamental principle that 'he who comes into equity must come with clean hands.'"  Id. (quoting Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945)).  District courts within this Circuit have repeatedly held that conduct amounting to willful infringement forecloses a laches defense.[3]  See I.O.B. Realty, Inc. v. Patsy's Brand, Inc., No. 16 Civ. 7682, 2017 WL 2168815, at *4 (S.D.N.Y. May 16, 2017) (declining to dismiss trademark infringement claim based upon allegations of willful infringement and bad faith); Societe Des Bains De Mer Et Du Cercle Des Etrangers a Monaco v. MGM Mirage, No. 08cv03157, 2008 WL 4974800, at *6 (S.D.N.Y. Nov. 24, 2008) (declining to dismiss based upon allegations of

---

[3] LCC seeks to distinguish cases decided at the pleadings stage or prior to trial.  Its argument, charitably put, is weak.  Here, there was a trial and there is a jury finding that LFI has proven LCC's willfulness by the preponderance of the evidence.

7

intentional infringement); Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp., 689

F. Supp. 2d 585, 598 n.9 (S.D.N.Y.), amended on reconsideration (S.D.N.Y. 2010) (laches

defense unavailable because of finding of willful infringement).  The Court concludes that the

evidence before the jury and its finding of willful infringement foreclose the laches defense.

Even if this Court were to reach the merits of LCC's laches argument, it would

fail on the merits.  The parties agree that six years is the appropriate statute of limitations to be

applied on this analysis of laches.  LFI filed the complaint in the present case on July 8, 2019.

(Doc 1.)  Accordingly, unless LFI knew or should have known that LCC was infringing its marks

before July 8, 2013, then "the presumption of laches does not attach and the defendant bears the

burden of proving the defense."  Fed. Treasury Enter. Sojuzplodimport v. Spirits Int'l B.V., 809

F.3d 737, 746 (2d Cir. 2016); see Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing

Co., 897 F.3d 413, 419 (2d Cir. 2018).  LCC points to no evidence that LFI knew or should have

known that LCC was infringing its marks before the first cease and desist letter sent by LFI on

December 20, 2013.  Because this occurred within the six-year statute of limitations period, the

burden is on LCC to prove its laches defense, and it has failed to do so.

"Laches is an equitable defense" and "[t]he ultimate determination of whether

laches bars a plaintiff's claim is within the trial court's discretion."  Fed. Treasury, 809 F.3d at

745-46 (citing Tri–Star Pictures, Inc. v. Leisure Time Prods., B.V., 17 F.3d 38, 44 (2d Cir.

1994).  To succeed on its claimed defense of laches, LCC "must prove that it has been prejudiced

by the plaintiff's unreasonable delay in bringing the action."  Conopco, Inc. v. Campbell Soup

Co., 95 F.3d 187, 192 (2d Cir. 1996).  "A trademark owner must take 'some affirmative action to

protect its rights against innocent parties' who have relied upon the trademark owner's

acquiescence."  Gidatex, S.r.L. v. Campaniello Imps., Ltd., 82 F. Supp. 2d 126, 134 (S.D.N.Y.

1999) (citing Saratoga Vichy Spring Co., Inc. v. Lehman, 625 F.2d 1037, 1041 (2d Cir. 1980)).

Nevertheless, the Second Circuit has held that "a simple warning letter" sent by the trademark

owner to the alleged infringer "suffices to avoid laches." Id. (citing Saratoga Vichy, 625 F.2d at

1041).

   Here, LFI sent LCC cease and desist letters in December 2013 and July 2014 in

response to what LFI viewed as LCC's infringing activity – these letters show that LFI was not

unreasonably passive in asserting its trademark rights in the years before filing suit.  In response

to these letters, LCC sent LFI letters with lulling statements which, along with LCC's declining

U.S. business, prompted LFI not to pursue further legal action.  (May 31, 2022 Tr. at 498-99;

Def. Ex. 73.)  There was testimony at trial that it was not until LCC escalated its infringing

activity from 2017 to 2019, and LFI employees encountered instances of actual customer

confusion, that LFI decided to file the present suit.  (May 26, 2022 Tr. at 112; May 27, 2022 Tr.

at 285, 320, 364-67; May 31, 2022 Tr. at 399-404.)  Thus, the record shows that any delay in

LFI's filing of the complaint was excusable and not unreasonable.  LCC's motion for judgment

as a matter of law based on the doctrine of laches will be denied.


II.  LCC'S MOTION TO AMEND OR ALTER THE JUDGMENT WILL BE DENIED.

   LCC moves to amend or alter the judgment pursuant to Rule 59(e), Fed. R. Civ. P.

It argues that (i) the jury verdict awarding disgorgement of LCC's profits is merely advisory and

the Court is required to make its own findings of fact and conclusions of law on the issue of

disgorgement; (ii) if disgorgement is awarded, the jury's award was improper because it does not

account for, or improperly accounts for, LCC's costs; and (iii) LFI is not entitled to punitive

damages because it did not seek actual damages under New York law.  For the following reasons, LCC's motion will be denied.

"A court may grant a Rule 59(e) motion only when the [movant] identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  Metzler Investment Gmbh v. Chipotle Mexican Grill, Inc., 970 F.3d 133, 142 (2d Cir. 2020) (quoting Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust, 729 F.3d 99, 104 (2d Cir. 2013)) (internal quotations omitted) (alterations in original).  A Rule 59(e) motion "may not be used to relitigate old matters, or to raise arguments . . . that could have been raised prior to the entry of judgment.'"  Exxon Shipping Co. v. Baker, 554 U.S. 471, 485 n.5 (2008) (quoting 11 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2810.1 (2d ed. 1995)).  A "Rule 59(e) motion is not intended to be a vehicle for a party dissatisfied with a court's ruling to advance new theories that the movant failed to advance in connection with the underlying motion, nor to secure a rehearing on the merits with regard to issues already decided."  Cordero v. Astrue, 574 F. Supp. 2d 373, 380 (S.D.N.Y. 2008).  Accordingly, the rule is "narrowly construed and strictly applied in order to discourage litigants from making repetitive arguments on issues that have been thoroughly considered."  Range Road Music, Inc. v. Music Sales Corp., 90 F. Supp. 2d 390, 391-92 (S.D.N.Y. 2000).

A.     The Action Was Properly Tried to a Jury as Sole Fact Finder.

LCC asserts that disgorgement of profits is a form of equitable relief that must be tried to the Court and any verdict by the jury in this case on profits is merely advisory.  The Court concludes that LCC forfeited any right it may have had to have the disgorgement remedy tried to the Court.

LFI demanded a jury trial on all issues in its complaint filed in July 2019.  (Doc 1.)  LCC never moved to strike LFI's jury demand with respect to the claim for disgorgement of profits. Further, the Court's Individual Practices required the parties to submit a proposed Joint Pre-Trial Order that included "[a] statement by each party as to whether the case is to be tried with or without a jury, and the number of trial days needed."  (Individual Practices at ¶ 6(A)(iv).)[4]  The parties' submission to this Court in response to the foregoing requirement states that "[t]his is a jury trial," with no carve out for any claim or issue.  (Doc 182 at 4.)

LCC also submitted proposed jury instructions that did not include a request that the Court decide the disgorgement on its own rather than submit the issue to the jury or that the jury's verdict be merely advisory; on the contrary, LCC provided a proposed instruction that explicitly instructs the jury that it may award damages in the form of LCC's profits and how to calculate such damages.  (Doc 163 at 47-48.)  The same is true of LCC's proposed verdict sheet, which contemplates the jury deciding the amount of profits to be awarded as damages.  (Doc 164 at 14.)

The Court provided the parties with its proposed jury instructions during the trial but before charging the jury, requesting that the parties provide any comments or objections to the proposed instruction – LCC never objected to the issue of disgorgement of profits being submitted to and decided by the jury and never claimed that its position was that such jury verdict would be merely advisory.[5]

---

[4] https://nysd.uscourts.gov/sites/default/files/practice_documents/PKC%20Individual%20Practices%20-%20Revised%20Jan%202020_0.pdf (last accessed Oct. 7, 2022).
[5] This contrasts with the issue of whether to submit to the jury the claim under New York General Business Law section 360-L that permits only an award of injunctive relief.  The Court heard the parties on the issue before deciding that unless further authority was found, it would not be submitted to the jury.  (May 27, 2022 Tr. at 161-63.)  The claim was ultimately dismissed by stipulation. (Doc 210.)

Under Rule 39(c)(2), Fed. R. Civ. P., "[i]n an action not triable of right by a jury, the court, on motion or on its own . . . may, with the parties' consent, try any issue by a jury whose verdict has the same effect as if a jury trial had been a matter of right." And the Second Circuit has stated that "where a party requests a jury determination of an issue requiring no special competence or authority belonging solely to the court, and the other party or parties fail to object, such silence may be deemed 'consent' under Rule 39(c)." Broadnax v. City of New Haven, 415 F.3d 265, 272 (2d Cir. 2005). LCC's silence amounted to consent to a binding jury verdict on the disgorgement damages.

    B.    The Jury Verdict on LCC's Profits Was Consistent with the
          Evidence, the Law and the Court's Instructions.

Next, LCC argues that the jury erred in failing to deduct LCC's expenses and costs from its gross revenues in arriving at profits to be awarded to LFI. Specifically, it argues that because its infringing product revenue amounts to 45% of its total revenue, 45% of its total expenses and costs should have been deducted in arriving at LCC's profits from the sale of the infringing goods. The Court concludes that the jury's verdict was sound and in accordance with the Court's instructions that were correctly framed.

As noted, the jury found that LCC's infringement was willful. (Doc 212 at 1). "When infringement is found to be willful, the district court should give extra scrutiny to the categories of overhead expenses claimed by the infringer to insure that each category is directly and validly connected to the sale and production of the infringing product. Unless a strong nexus is established, the court should not permit a deduction for the overhead category." Hamil America Inc. v. GFI, 193 F.3d 92, 107 (2d Cir. 1999).

The Court instructed the jury on the deduction of expenses and costs, noting that the burden of proof was on LCC to establish these deductions. The Court instructed the jury that

SPA-14

LCC had no evidence on the costs of goods and thus no deduction could be made be made for those costs.  As to other costs, the Court instructed the jury to consider whether there is a connection between the overhead expense and the infringing goods to warrant a deduction:

> Under the Lanham Act, plaintiff may be entitled to damages in the form of profits earned by defendant from the sale of its products that are attributable to the infringement.
>
> If you determine that an award of defendant's profits is appropriate, profit is determined by deducting expenses from gross revenue.  Plaintiff has the burden of proving by a preponderance of the evidence the amount of defendant's gross revenues from its sale of products bearing the infringing mark.
>
> Expenses are operating and production costs incurred in producing the gross revenue.  Defendant has the burden of proving by a preponderance of the evidence any costs or expenses to be deducted from its gross revenue.  You may not deduct the costs of goods sold and other direct costs associated with those goods because defendant can point to no evidence in the record which would differentiate the costs of assertedly infringing goods from those that are not asserted to be infringing.
>
> Also, defendant must demonstrate a sufficient connection between each claimed overhead expense and the sale of infringing products in order to deduct the expense from its gross revenues for infringing sales.  An item of overhead may be deducted if, but only if you find that the entirety of the overhead expense is attributable to the infringing goods.  If defendant fails to establish any expense by a preponderance of the evidence, you should not deduct that expense from the gross revenues.

(June 1, 2022 Tr. at 625-26.)[6]

During deliberations, the jury sought further clarity on the last two sentences of the above instruction relating to "overhead expense."  Without objection from LCC, the Court gave the following supplemental instruction:

---

[6] The Court discussed the instruction with the parties and asked if LCC had any objection.  LCC's counsel responded: "No, your Honor, other than obviously we also preserve our right with our motion with respect to damages sought by plaintiff."  (June 1, 2022 Tr. at 597-98.)

13

The Court instructs you that for these purposes overhead means the ongoing costs to operate a business other than the cost of goods sold and other direct costs associated with those goods.  Overhead includes items such as rent, utilities and support staff salaries.  If defendant has proven that an overhead expense applies exclusively to the infringing goods, then you may deduct it from gross revenues attributable to the infringing goods.  If defendant has not so proven, then you may not deduct it from gross revenues attributable to the infringing goods.

(Court Ex. 20; June 2, 2022 Tr. at 664-67).

The jury's verdict was consistent with a finding that LCC had not met its burden of proof on overhead expenses.  This was fully supported by the trial evidence.

The trial testimony from LCC's witness demonstrated that it sold both home goods and clothing in its stores and on its website.  (May 27, 2022 Tr. at 246.)  The costs presented to the jury by LCC did not distinguish expenses and costs of the infringing goods from other items in its home goods and the clothing lines.  (Id. at 247-48.)  As to store rentals and warehouse costs, its witness testified: "It's extremely difficult to divide those.  I would never do that on a product basis.  We do it as a total cost." (Id. at 247.)  The witness confirmed that the figures presented to the jury for administrative costs, personnel costs, selling expenses, financial expenses and marketing costs were combined figures for all clothing and home goods.  (Id. at 247-48.)

LCC now argues that because revenue from its infringing products amounted to 45% of its total U.S. gross revenue, the Court should assume the role as sole fact finder and subtract 45% of LCC's expenses and costs from gross revenue to arrive at profits.  Put another way, it argues that the Court as sole fact finder should assume that the expenses and costs attributable to infringing goods were precisely the same percentage as their contribution to gross revenue.  LCC's position is without merit.  LCC's proposed formula is

14

an extrapolation that uses percentage of revenue as a surrogate for overhead.  For example, no effort was made at trial to show the floor space needed to display or warehouse infringing items of bedding compared with clothing or other items of home goods.  LCC's proposed extrapolation does not provide a "strong nexus" that "directly and validly" connects "each category" of costs to the sale and production of the infringing products.  See Hamil, 193 F.3d at 107.

"[A] court should not hesitate to reject a formula which allows the willful infringer to deduct more of its overhead than was directly implicated in the manufacture of the infringing product."  Id.  Here, the Court did not reject or foreclose any extrapolation formula proffered by LCC on overhead expenses.  It did not rule as a matter of law that LCC could not argue to the jury that it had established offsetting overhead expenses.  Rather, the jury implicitly found that LCC had not met its burden of proving offsetting overhead expenses attributable to the infringing goods.

LCC also argues that the disgorgement award should be altered because LFI failed to prove instances of infringement that occurred prior to 2017.[7]  The Court concludes that LFI provided ample evidence of infringement prior to 2017.  For example, Tommy Lindhe testified at trial that LCC began operating brick-and-mortar stores in the U.S. in 2012, and that those stores sold home textiles that contained the infringing marks.  (May 26, 2022 Tr. at 94-95, 138-39.)  LFI also showed at trial that it sent cease and desist letters to LCC in 2013 and 2014 regarding what LFI considered infringing activity by LCC.  (Def. Ex. 73.)  And there was evidence that LCC engaged in U.S.-focused social media marketing using the infringing marks prior to 2017.  (May 26, 2022 Tr. at 85-86, 89-94; May 27, 2022

---

[7] The Court notes the tension between LCC's argument that there is no evidence of infringement prior to 2017 and its argument that LFI's claims are barred by laches because the infringement began in 2012.

Tr. at 239-42.)  The jury appropriately considered this evidence and concluded that LCC

infringed LFI's trademarks prior to 2017.  The disgorgement of profits prior to 2017 is not a

"clear error" or "manifest injustice" that would require alteration of the judgment.  See

Metzler Investment, 970 F.3d at 142.

     C.    Punitive Damages Are Permissible Under the State Law Claim.

     LCC contends that the Court should alter the jury's award because LFI may not

recover punitive damages on the state law unfair competition claim because the jury did not find

actual damages on the claim.  As will be shown, because the elements of LFI's Lanham Act

claim on which the jury awarded damages coincides with the elements of the state law claim of

unfair competition, the Court properly instructed the jury as a matter of law that a finding of

liability on the Lanham Act claim was a finding of liability on the state law unfair competition

claim.  In turn, a finding of liability on the state law unfair competition claim permitted the jury

to consider the question of punitive damages.

     To begin with, there is no dispute that punitive damages may be awarded on the

state law unfair competition claim. See Getty Petroleum Corp. v. Island Transp. Corp., 878 F.2d

650, 657 (2d Cir. 1989) ("[W]e see no merit in [defendant's] contention that punitive damages

are not available under New York law for a claim of unfair competition.").  At the Final Pretrial

Conference, the following exchange occurred:

> THE COURT: But what's been proffered to me is that you can get
> punitive damages under New York law for unfair competition
> because it sounds in tort, which sounds plausible.  Do you have
> any reason to challenge that proposition?

> [LCC's COUNSEL]: No, I think that's accurate.  I think what the memo or what we were trying to do is make the plaintiff put its cards on the table and say which of these things is where the damages actually lie instead of just throwing it all against the wall and hoping something sticks.

(Aug. 31, 2021 Tr. at 40-41.)

On the second day of trial and with the jury instructions in mind, the Court inquired whether on the facts of this case, a jury verdict on the Lanham Act claim would necessarily establish the state law trademark infringement and unfair competition claims. The following exchange transpired with LCC's counsel:

> THE COURT: [D]o you agree, from the defense standpoint, that if the federal trademark infringement claim is established, that the New York unfair competition claim is established as well?
>
> [LCC's COUNSEL]:  Yes, we do, your Honor.
>
> THE COURT: Okay.  All right.  So it would seem to me, based on what I have here, that it would be appropriate for me to tell the jury that if they find the federal trademark claim established, that the state unfair competition, the state common law trademark infringement is established, and on those claims they may consider the issue of punitive damages.

(May 27, 2022 Tr. at 175.)  The Court set a schedule for objections to the Court's tentative rulings and on the latest draft of the jury instructions.  No pertinent objection was lodged by LCC.

While LCC argued that LFI had not presented facts that would warrant an award of punitive damages, there was no substantive objection by LCC to the content of the instruction on the state law unfair competition and trademark infringement claims nor any objection to the punitive damage instruction.[8]  The jury was instructed that "if you

---

[8] The New York common law trademark and unfair competition claims were pled in separate counts of the complaint, but on the facts of this case, they are the same.  "Historically, two causes of action have existed to protect the user of a trade-mark or trade name from its improper use by another--viz., trade-mark infringement and unfair

have found for [LFI] on the federal Lanham Act claims, then you have found for [LFI] on

trademark infringement and unfair competition under New York law" and further that "[i]f

you have found for [LFI] on the federal Lanham Act claims, you may consider whether to

award punitive damages for unfair competition under New York law."  (June 1, 2022 Tr.

at 626.)  At no time did LCC's counsel urge that a separate finding of damages or actual

injury on the common law unfair competition claim was necessary.

   Seizing on the proposition of New York law that "[i]n order to justify an award of

punitive damages there must be a showing of actual injury which would justify an award of

actual or compensatory damages,"  see Ebker v. Tan Jay Int'l Ltd., 741 F. Supp. 448, 472

(S.D.N.Y. 1990) (citing Gill v. Montgomery Ward & Co., 284 A.D. 36, 41 (3d Dep't, 1954)),

LCC argues for the first time in this motion that an award of the infringer's profits does not show

actual injury.  But the Court's comprehensive instructions on punitive damages included an

instruction that "[t]he amount of punitive damages that you award must be both reasonable and

proportionate to the actual and potential harm suffered by plaintiff and to the compensatory

damages you awarded plaintiff."  (June 1, 2022 Tr. at 628) (emphasis added).  This jury awarded

LFI an amount of punitive damages ($925,000) that was substantially less than the damages

awarded ($1,641,963).

  There is also nothing about the nature of disgorgement damages that precludes them from

serving as the premise for a punitive damage claim.  In Tiffany & Company v. Costco Wholesale

Corporation, Chief Judge Swain rejected Costco's argument that Tiffany was precluded from

---

competition."  Allied Maint. Corp. v. Allied Mech. Trades, Inc., 42 N.Y.2d 538, 542 (1977). "It is fundamental that
the substantive law of trade-marks is merely a portion of the broader law of unfair competition. . . ." Dell Publ'g Co.
v. Stanley Publ'ns, Inc., 9 N.Y.2d 126, 133 (1961).  Unfair competition is broader and protects "nontechnical,
common-law trade-mark--marks used although not registered--as well as trade names." Allied Maint., 42 N.Y.2d at
542. "[B]oth require a showing that the public is likely to confuse the defendant's product or service with that of the
plaintiff. . . ." Id. at 543.  On the facts of this case the two claims merge.

seeking punitive damages because it "only sought an accounting of profits and not 'actual damages.'"  274 F. Supp. 3d 216, 225-26 (S.D.N.Y. 2017).  Rather, the court held, "punitive damages are available where a plaintiff pursued an accounting of profits and statutory damages under the Lanham Act." Tiffany & Co. v. Costco Wholesale Corp., No. 13 CV 1041, 2019 WL 120765, at *6 (S.D.N.Y. Jan. 7, 2019).  The Second Circuit vacated and remanded the decision on other grounds, but it expressly "decline[d] to address the question whether punitive damages would be available to Tiffany if a jury were to find in its favor on remand."  Tiffany & Co. v. Costco Wholesale Corp., 971 F.3d 74, 96 (2d Cir. 2020).  Without the benefit of controlling case law speaking directly to this issue, the Court concludes that, under the circumstances of the present case, the jury's award of disgorgement of profits provides proof of the actual harm to LFI that supports the award of punitive damages.

Disgorgement under the Lanham Act is a type of compensatory award.  One such indication comes from § 1117(a) itself, which states that a court may adjust "the amount of the recovery based on profits" if it finds the recovery excessive or inadequate, but that in either case the recovery "shall constitute compensation and not a penalty."  15 U.S.C. § 1117(a) (emphasis added).  The Supreme Court has observed that the Lanham Act provides for "compensatory recovery measured by the profits that accrued to the defendant by virtue of his infringement, the costs of the action, and damages which may be trebled in appropriate circumstances." Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 720 (1967), superseded by statute on other grounds, Pub. L. No. 93-600, § 3, 88 Stat. 1955 (emphasis added).  Courts in this District routinely characterize the disgorgement of profits under the Lanham Act as an award of actual or compensatory damages.  See, e.g., Malletier v. Artex Creative Int'l Corp., 687 F. Supp. 2d 347, 355-56 (S.D.N.Y. 2010) ("The typical starting point for assessing statutory damages is

19

actual damages, such as plaintiff's loss and defendant's profits."); Sara Lee Corp. v. Bags of New York, Inc., 36 F. Supp. 2d 161, 165 (S.D.N.Y. 1999) (characterizing § 1117(a) of the Lanham Act, which provides for disgorgement of profits, as providing "strictly compensatory relief").  And other district courts within this Circuit have done the same.  See, e.g., Safety Nat'l Casualty Corp. v. Floor and Decor Outlets of America, Inc., No. 21-cv-2023, 2022 WL 1720433, at *5 (E.D.N.Y. May 27, 2022) ("Under New York law, then, [Lanham Act] disgorgement awards are, at least in part, compensatory in nature."); Ideal World Mktg., Inc. v. Duracell, Inc., 997 F. Supp. 334, 338 (E.D.N.Y. 1998) ("Although profits and damages are, as a practical matter, two very different concepts, . . . it is clear from the Second Circuit's language in [George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532 (2d Cir. 1992)] that, in the context of trademark infringement, there is a significant overlap between them.").

In addition, the trial record demonstrated that LFI suffered actual harm from LCC's conduct.  (See, e.g., May 27, 2022 Tr. at 320-21 (testimony by Patricia Rogers that in fall 2019 two customers became frustrated after arriving at an LFI showroom that they had confused for an LCC store), 364-67 (testimony by Robert Stamper that in summer 2018 at a home goods exposition several designers told Stamper that they were not interested in purchasing LFI's products or visiting LFI's showroom after those designers had visited an LCC store and concluded that the offerings were "just not [their] look").)

LCC's motion to alter or amend the judgment because the jury was not asked to find actual harm to LFI as a pre-condition to an award of punitive damages on the unfair competition claim will be denied.

III. LFI'S MOTION FOR A PERMANENT INJUNCTION WILL BE GRANTED.

   LFI moves for a permanent injunction pursuant to the Lanham Act, 15 U.S.C. §

1116.  For the following reasons, LFI's motion will be granted to the extent indicated herein.

   "The decision to grant or deny permanent injunctive relief is an act of equitable

discretion by the district court, reviewable on appeal for abuse of discretion."  eBay Inc. v.

MercExchange, L.L.C., 547 U.S. 388, 391 (2006).  A plaintiff seeking a permanent injunction in

a trademark infringement case must demonstrate: "(1) that it has suffered an irreparable injury;

(2) that remedies available at law, such as monetary damages, are inadequate to compensate for

that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a

remedy in equity is warranted; and (4) that the public interest would not be disserved by a

permanent injunction."  Id.; Salinger v. Colting, 607 F.3d 68, 78 (2d Cir. 2010) ("eBay strongly

indicates that the traditional principles of equity it employed are the presumptive standard for

injunctions in any context."); Fresh Del Monte Produce Inc. v. Del Monte Foods Co., 933 F.

Supp. 2d 655, 660 (S.D.N.Y. 2013) (concluding that the eBay test for permanent injunctive relief

applies to Lanham Act cases).  The Court will address each of these considerations in turn.

   "The first and second factors in the eBay test often blend together, and in each

case, 'the court must actually consider the injury the plaintiff [has] suffer[ed] . . . , paying

particular attention to whether the "remedies available at law, such as monetary damages, are

inadequate to compensate for that injury."'"  Fresh Del Monte Produce, 933 F. Supp. 2d at 664

(quoting Salinger, 607 F.3d at 80.)  "Irreparable harm exists in a trademark case when the party

seeking the injunction shows that it will lose control over the reputation of its trademark . . .

because loss of control over one's reputation is neither 'calculable nor precisely compensable.'"

U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 800 F. Supp. 2d 515, 541-42 (S.D.N.Y. 2011)

(citing New York City Triathlon, LCC v. NYC Triathlon Club, Inc., 704 F. Supp. 2d 305, 343 (S.D.N.Y. 2010)).

The jury found that LFI proved by a preponderance of the evidence that consumers were likely to be confused between the marks of LFI and LCC.  (Doc 212 at 1; June 1, 2022 Tr. at 617-18.)  Because of this confusion, LFI will not be able to control its reputation and good will.  Indeed, there was testimony at trial that consumer confusion between LFI and LCC actually did harm LFI's reputation because certain consumers created an impression of LFI based on their knowledge of LCC's products.  (See, e.g., May 27, 2022 Tr. at 320-21, 364-67.) LFI's careful efforts to curate its branding are therefore undercut by the confusion caused by LCC's marks.  Accordingly, LFI is likely to be irreparably injured in the absence of a permanent injunction because LFI would lose control over its reputation and goodwill, and such reputational harm cannot be easily quantified or remedied through money damages alone.  See U.S. Polo Ass'n, 800 F. Supp. 2d at 541-42.

As to the balance of the hardships, LCC contends that it would be subject to significant hardship primarily because it has contributed significant time and resources to ensuring its marketing and advertising complied with the terms of the Settlement Agreement.[9]  It also asserts that any hardship to LFI must be minimal because LCC had been using its Lexington marks in the U.S. pursuant to the terms of the Settlement Agreement since 2012.  Given the jury's finding that LCC breached the Settlement Agreement (Doc 212 at 1), the Court gives little weight to this argument. On the contrary, LCC's past conduct shows its willingness to violate the terms of the Settlement Agreement, which does not provide support for its claim of hardship.

---

[9] For a recounting of the terms of the Settlement Agreement, see the Court's opinion and order on the parties' cross-motions for summary judgment. (Doc 115); Lexington Furniture Indus., 2021 WL 1146276, at *10.

Rather, the hardship to LFI caused by LCC's infringement of its trademarks outweighs any claimed hardship by LCC.

As to serving the public interest, the public "has a protectable interest in being free from confusion, deception and mistake." U.S. Polo Ass'n, 800 F. Supp. 2d at 541. LCC's primary argument with respect to the interest of the public is that LFI has failed to show that consumers are likely to be confused by LCC's marks. This argument, however, is wholly contradicted by the jury's verdict at trial that LCC infringed upon LFI's marks – which required a finding of a likelihood of consumer confusion – as well as the trial testimony regarding incidents of actual consumer confusion.

LCC contends, however, that LFI's proposed permanent injunction (Doc 237) is overbroad. True, a permanent injunction must be "narrowly tailored to fit specific legal violations" and "should not impose unnecessary burdens on lawful activity." Starter Corp. v. Converse, Inc., 170 F.3d 286, 299 (2d Cir. 1999) (quoting Waldman Publ'g Corp. v. Landoll, Inc., 43 F.3d 775, 785 (2d Cir. 1994)). But a "party who has once infringed a trademark may be required to suffer a position less advantageous than that of an innocent party . . . and a court can frame an injunction which will keep a proven infringer safely away from the perimeter of future infringement." Guthrie Healthcare Sys., 826 F.3d at 47 (quoting Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 2017 (2d Cir. 2003), abrogated on other grounds by 4 Pillar Dynasty LLC v. New York & Co., 933 F.3d 202, 215-16 (2d Cir. 2019)).

The parties previously agreed in the Settlement Agreement that LCC could use the Lexington flag logo and "Lexington Clothing Company" as the primary identifier on certain products sold in the U.S. LCC now contends that the permanent injunction is overbroad because it does not carve out the flag logo and "Lexington Clothing Company" for use by LCC. But the

jury found that LCC breached the Settlement Agreement, that LCC willfully infringed upon LFI's trademarks and that LCC's use of Lexington marks caused a likelihood of consumer confusion.  The permanent injunction appropriately enjoins LCC's use of Lexington-formative marks, including the flag logo and "Lexington Clothing Company," in the future.

The proposed injunction is also appropriately tailored in scope.  It only enjoins the use of infringing marks on products or in advertising "sold in or directed to the United States." (Doc 237 at 2.)  LFI challenged only LCC's use of such marks in the U.S., and the geographic scope of the proposed permanent injunction is limited to only the U.S.  The proposed permanent injunction also applies only to "Home Goods" which includes "home furnishings, textiles and decor."  (Id.)  This is an appropriate tailoring of the products to which the permanent injunction applies and also avoids unnecessarily burdening LCC, as LCC admits that it primarily sells clothing and that its home goods offerings are a small subset of its overall business.  The scope of the proposed permanent injunction, including geographic scope and scope of products implicated, is therefore appropriately tailored to the circumstances of the case and would not unnecessarily burden LCC.  LFI's proposed permanent injunction will be granted.

CONCLUSION

The Court has considered all of the parties' arguments, including those not explicitly addressed herein.  LCC's motion to alter or amend the judgment (Doc 241) is DENIED.  LCC's motion for judgment as a matter of law (Doc 238) is DENIED.  LFI's motion for a permanent injunction (Doc 234) is GRANTED.  LFI shall update its application for fees and costs within 21 days of the date hereof.  LCC may respond 7 days thereafter.

24

SPA-26

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
         October 24, 2022